UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VIACELL, INC ,                              )
            Plaintiff,             )
                                )      Civil Action No  04-1335
            v                      )
                                )      **JURY TRIAL DEMANDED**
PHARMASTEM THERAPEUTICS, INC ,              )
            Defendants            )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF VIACELL'S MOTION FOR ENTRY OF A PRELIMINARY INJUNCTION

Jeffrey L  Moyer, Esq  (#3309)
Alyssa M  Schwartz (#4351)
Richards, Layton & Finger
One Rodney Square
P.O  Box 551
Wilmington, DE  19899
(302) 651-7700
Attorneys for ViaCell, Inc

*Of Counsel*:
Paul F  Ware, Jr , P C
John C  Englander, Esq
James C  Rehnquist, Esq
Elaine Herrmann Blais, Esq
Christopher T  Holding, Esq
Goodwin Procter LLP
Exchange Place
Boston, MA 02109

Exhibit B

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 2

    The Campaign of Threatening and Deceptive Communications ........................... 4

    The "Amnesty Agreements" ................................................................................ 8

    The PharmaStem Patents Do Not Prevent Doctors and Other Healthcare
        Providers From Collecting Cord Blood and Providing It To ViaCell ......... 9

        A    The '553 Patent ...................................................................... 9

        B    The '681 Patent ................................................................... 11

        C    The '427 and '645 Patents .................................................. 12

    PharmaStem's Wrongful Conduct is Achieving PharmaStem's Illegal Goal ......... 14

ARGUMENT ..................................................................................................... 17

I    VIACELL IS ENTITLED TO A PRELIMINARY INJUNCTION TO STOP
    PHARMASTEM'S UNLAWFUL AND ANTICOMPETITIVE CONDUCT
    IN VIOLATION OF THE SHERMAN ACT ................................................. 17

        A    ViaCell Has a Likelihood of Success on the Merits .................... 17

               1    The "Amnesty Agreements" are Agreements under
                   Section 1 ....................................................................... 18

               2.    The Amnesty Agreements Unreasonably Restrain Trade ....... 19

               3    The Object and Conduct of PharmaStem's Coerced Boycott
                   is Illegal ...................................................................... 21

               4    Injury to ViaCell from PharmaStem's Coerced Boycott ....... 23

        B    ViaCell Has Suffered And Continues To Suffer Irreparable Harm
            As A Result Of PharmaStem's Boycott Campaign ..................... 26

        C    The Public Will Be Irreparably Harmed If PharmaStem Is
            Permitted To Continue Its Boycott Campaign ......................... 27

        D    Balancing The Equities .......................................................... 28

i

II    VIACELL ALSO IS ENTITLED TO A PRELIMINARY INJUNCTION UNDER
      MASS. GEN. LAWS CHAPTER 93A TO STOP PHARMASTEM'S UNFAIR
      AND DECEPTIVE TRADE ACTS AND PRACTICES . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

ii

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Angelico, M.D. v. Lehigh Valley Hospital, Inc.*, 184 F 3d 2686
(3rd Cir. 1999) ............................................................... 18, 23, 24, 25

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) ................................. 25

*C&W Constr. Co. v. Brotherhood of Carpenters and Joiners of Am., Local 745*, 687
F Supp. 1453 (D. Haw. 1988) ....................................................... 19

*Cargill, Inc. v. Montfort of Colorado, Inc.*, 479 U.S. 104 (1986) ......................... 17

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) ....................... 18

*Ethyl Gasoline Corp. v. United States*, 309 U.S. 436 (1940) ............................. 22

*Glen Holly Entertainment, Inc. v. Tectronix Inc.*, 343 F 3d 1000 (9th Cir. 2003) ........ 25

*In re K-Dur Antitrust Litigation*, __ F Supp 2d __, 2004 WL 2203844, at *10
(D.N.J. Sept. 29, 2004) ............................................................ 21, 23

*In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F 2d 1144 n 9
(3rd Cir. 1993) ..................................................................... 23, 24

*In re Warfarin Sodium Antitrust Litigation*, 214 F 3d 395 (3rd Cir. 2000) ... 17, 18, 19, 23, 24

*KOS Pharm., Inc. v. Andrx Corp.*, 369 F 3d 700 (3rd. Cir. 2004) ......................... 17

*Leitch Mfg. v. Barber Co.*, 302 U.S. 458 (1938) ........................................ 22

*Massachusetts School of Law at Andover v. American Bar Ass'n*, 952 F Supp. 884 (D.
Mass 1997), aff'd 142 F 3d 26 (1st Cir. 1998) ...................................... 30

*MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc.*, 62 F 3d 967 (7th Cir. 1995) ..... 18, 19

*Mercoid Corporation v. Mid-Continent Inv. Co.*, 320 U.S. 661 (1944) .................... 22

*Northwest Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co.*, 472 U.S.
284 (1985) ......................................................................... 20

*Novartis Consumer Health, Inc. v. Johnson & Johnson*, 290 F 3d 578 (3rd Cir. 2002) ..... 26

*Opticians Ass'n of Am. v. Independent Opticians of Am.*, 968 F 2d 187 (3rd Cir. 1990) ... 26

*Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc.*, 143 F 3d 800 (3rd Cir. 1998) .... 17, 26

i

*PharmaStem Therapeutics, Inc v. ViaCell, Inc*, 2004 WL 2127192, at *6
   (D Del Sept 15, 2004) ........................................................................ 10, 11

*Popkin v National Ben Life Ins Co.*, 711 F Supp 1194, 1199-1202 (S D N Y 1989) ......29

*Rossi v Standard Roofing, Inc.*, 156 F 3d 452 (3rd Cir 1998) ............................... 19

*Standard Oil v. U.S.*, 221 U S 1, 58 (1911) ............................................... 18

*Transparent-Wrap Mach Corp v. Stokes & Smith Co.*, 329 U S 637 (1947) ............... 22

*U.S. v Masonite Corp.*, 316 U S 265 (1942) ............................................... 22

*Toys "R" Us v FTC*, 221 F 3d 928 (7th Cir 2000) ........................................ 20

*Weiss v. York Hospital*, 745 F 2d 786 (3rd Cir 1984) ..................................... 18

*Zenith Radio Corporation v. Hazeltine Research, Inc.*, 395 U S 100 (1969) ......22, 23, 24

## STATE CASES

*Levings v. Forbes & Wallace, Inc.*, 8 Mass App Ct 498, 504 N E 2d 149 (1979) ......... 30

*Brandt v. Olympic Constr , Inc.*, 16 Mass App Ct 913, 449 N E 2d 1231 (1983) ........ 30

*Jillian's Billiard Club of Am v. Beloff Billiards, Inc.*, 35 Mass App Ct 372, 619
   N E 2d 635 (1993) .......................................................................... 30

*Kensallis Finance Ltd V. Fern*, 421 Mass 659 N E 2d 731 (1996) .......................... 30

*Massachusetts Farm Bureau Federation, Inc v. Blue Cross of Massachusetts, Inc.*, 403
   Mass 722, 532 N E 2d 660 (1989) ........................................................ 30

*Nei v. Burley*, 388 Mass 307, 446 N E 2d 674 (1983) .................................... 30

*Piccutio v. Dwyer*, 32 Mass App Ct 137, 586 N E 2d 38 (1992) ........................ 31

*PMP Associates, Inc v. Globe Newspaper Co.*, 366 Mass 593, 321 N E 2d 915, 917
   (1975) ..................................................................................... 30

## FEDERAL STATUTES

15 U S C § 1 .............................................................................. 18

15 U S C §§ 15, 26 .................................................................. 17, 23

35 U S C §271(c) ....................................................................... 10

RLF1-2794838-1

15 U S C. § 26 .................................................................................. 17

## STATE STATUTES

Mass. Gen. Law 93A, §11 .......................................................... 28, 29, 30

## FEDERAL RULES

Federal Rules of Civil Procedure 65 ............................................ 31

## OTHER AUTHORITIES

U S. Patent No 5,004,681 .......................................................... 3

U.S. Patent No 5,192,553 ............................................................ 2

U.S. Patent No 6,461,645 ...................................................... 4, 5

U.S. Patent No 6,569,427 .......................................................... 4

U.S. Patent No 6,605,275 .......................................................... 4

RLF1-2794838-1

## INTRODUCTION

ViaCell seeks a preliminary injunction to stop the illegal boycott PharmaStem is organizing and prosecuting against it  Through a variety of wrongful actions, PharmaStem is coercing doctors and hospitals to sign contracts that prevent them from having <u>any</u> dealings with ViaCell (and certain other private cord blood banks) concerning umbilical cord blood collection and storage  As a result, families who wish to collect the cord blood from their new-born child and store it with one of those blood banks are being prevented from doing so  By its own admission, PharmaStem has entered into these contracts – which PharmaStem calls "Amnesty Agreements" – with hundreds of doctors  PharmaStem's goal is far broader:  it has bombarded tens of thousands of doctors with false and misleading letters, and threatened them with litigation if they refuse to sign  Not surprisingly, doctors are succumbing to PharmaStem's tactics rather than subjecting themselves to the costs and inconvenience of resisting

PharmaStem's actions to implement this boycott are illegal  PharmaStem is trying to use these contracts with doctors to achieve market domination – something its patents do not confer and the law prohibits  PharmaStem seeks to force every blood bank to pay it royalties on every unit of cord blood stored  As discussed below, and as this Court is aware, PharmaStem's patents do <u>not</u> apply to all cord blood collection and storage  Equally important, PharmaStem's patents clearly do <u>not</u> prevent the simple collection of cord blood by obstetricians or other health care providers  Nonetheless, PharmaStem's "Amnesty Agreements" require the doctors to stop all umbilical cord blood collection for storage at ViaCell  These contracts are not justified by PharmaStem's patents  They unreasonably restrain trade, in violation of the antitrust laws  Unless PharmaStem is stopped, its conduct inevitably will require families to pay artificially higher prices for cord blood banking services  PharmaStem's conduct also constitutes unfair trade acts and practices and unfair competition in violation of applicable state law

ViaCell's losses from PharmaStem's actions are irreparable and ongoing  These illegal contracts are depriving ViaCell of its potential sources for stored cord blood, which is essential to its business  Moreover, the public has an equally strong interest in stopping PharmaStem, keeping ViaCell's potentially lifesaving medical technology available, and avoiding higher prices caused by PharmaStem's behavior  Further, families about to have children should not be confronted with the choice of not storing their cord blood, or switching from their doctor of choice if the family wants to store the newborn's cord blood with ViaCell  In short, neither ViaCell nor the public should be held hostage to PharmaStem's anticompetitive campaign to extract license royalties where none are warranted

For all these reasons, the Court should enter a preliminary injunction that:

(a)  enjoins PharmaStem from soliciting, advertising, promoting, signing, or accepting any "Amnesty Agreements" with physicians or other health care providers, or soliciting, advertising, promoting, signing, or accepting  any other such agreements that require health care providers to stop collecting cord blood to be stored at ViaCell or otherwise stop doing business with ViaCell;

(b)  enjoins PharmaStem from enforcing, attempting to enforce, or threatening to enforce, any "Amnesty Agreements" already signed; and

(c)  holds that physicians or other health care providers who have already signed "Amnesty Agreements" cannot incur liability for infringement of any of PharmaStem's patents based on any conduct occurring prior to or during the pendency of this lawsuit

## BACKGROUND

As the Court knows, PharmaStem previously sued ViaCell and other cord blood banks alleging that they infringe two of PharmaStem's patents. U S  Patent No  5,192,553 (the "'553

2

Patent") and U S  Patent No  5,004,681 (the "'681 Patent") (the lawsuit is referred to herein as the "Competitor Litigation")  In October 2003, the jury returned a verdict in PharmaStem's favor  On September 15, 2004, however, this Court entered judgment as a matter of law that ViaCell does not infringe the '553 Patent and granted a new trial concerning infringement of the '681 Patent

ViaCell filed this new case on October 5, 2004   The new case concerns unlawful, anticompetitive, and deceptive conduct undertaken by PharmaStem <u>after</u> the October 2003 jury verdict  Apparently anticipating that the verdict would be set aside (as it was), PharmaStem launched its new campaign directed at doctors and hospitals in June of this year   ViaCell's complaint asserts claims against PharmaStem, based on this new campaign, for threatened and actual violations of the antitrust laws (Count I-V), violations of the Lanham Act (Count VI), violations of state law prohibiting unfair and deceptive practices (Count VII), and tortious interference (Counts VIII-IX)  ViaCell seeks injunctive relief and damages

There are three central facts that demonstrate the wrongfulness of PharmaStem's new conduct: (1) PharmaStem has continued to make misleading statements and unfounded threats of infringement to obstetricians on a mass basis, without any possible good-faith basis; (2) PharmaStem has promoted, solicited, and signed (and continues to promote, solicit, and sign) these so-called "Amnesty Agreements" with obstetricians that require the obstetricians to boycott ViaCell and certain other private cord blood banks completely, and (3) neither the '553 and '681 patents with which the Court is familiar, nor the three newer (and substantially similar) patents PharmaStem has obtained, justify the assertion that doctors and health care providers infringe PharmaStem's patents by collecting cord blood and providing it to ViaCell or other blood

3

banks [1] ViaCell addresses these three central facts below  In addition, ViaCell discusses how PharmaStem's coerced boycott is already causing unlawful effects, and how it threatens to injure, and has injured, both ViaCell and families who wish to preserve the cord blood of their new-born children

## The Campaign of Threatening and Deceptive Communications

PharmaStem's new campaign began with a letter dated June 1, 2004 that it sent to over 25,000 obstetricians  *See* Exhibit 1 ("June Letter")  This Court already has ruled that the June 1 letter contained false and misleading statements, concerning obstetricians' potential legal liability, and the Court specifically enjoined PharmaStem "from making any further false or misleading communications to obstetricians "  *See* Order dated July 2, 2004, attached hereto as Exhibit 2  PharmaStem chose to ignore the Court's order and instead to make a series of additional false and misleading communications to obstetricians, to further its own anticompetitive and unlawful scheme, as described below

PharmaStem followed its June letter with a new wave of lawsuits, in each of which PharmaStem sued a private cord blood bank and one or more health care providers (individual physicians), group medical practices and a hospital, for patent infringement  PharmaStem filed five such lawsuits, in locations throughout the country (the "Provider Lawsuits") [2]  In each of the

---

[1]    The newer patents are U S  Patent No  6,569,427 (the "427 Patent"), U S  Patent No 6,461,645 (the "'645 Patent"), and U S  Patent No  6,605,275 (the "'275 Patent")

[2]    Those lawsuits are: (1) *PharmaStem Therapeutics, Inc  v  Corcell, Inc., Molly McBride, M.D., and Carlo M. Croce, M.D.*, C A  No  04-CV-3561 (E.D  Pa ); (2) *PharmaStem Therapeutics, Inc  v  Cord Blood Registry, Inc  and Sutter Health, Inc*, C A  No  04-3072 (PVT) (N D  Cal ); (3) *PharmaStem Therapeutics, Inc  v  Cryo-Cell International, Inc. and Bruce Zafran, M.D* , C A  No  8:04-CV-1740-T-30TGW (M D  Fla ); (4) *PharmaStem Therapeutics, Inc  v  Curesource, Inc., Monica Aszlerbaum, Andrew Cassidenti, Eunice U  Lee, Carla Wells, Anita York, Eliot Romero, Kathy Anderson, Nasrin Farbakhsh, Bruce A  Hagadorn, Rahasree T  Seshadri, Arthur Goldstein, and Charles W  Moniak*, SACV04-921 (GLT) (C D  Cal ); and (5) *PharmaStem Therapeutics,*

4

Provider Lawsuits, PharmaStem made a boilerplate allegation of infringement of a different patent, U S No 6,569,427 (the "'427 patent") against both the defendant private cord blood bank and at least one health care provider

On August 2, 2004, after PharmaStem filed the Provider Lawsuits, PharmaStem issued a press release ("August 2 Press Release"), a copy of which is attached hereto as Exhibit 3    The August 2 Press Release contained statements similar to those in the PharmaStem June Letter which the Court had found to be false and misleading, and which were at odds with the July 2 injunction    PharmaStem caused copies of the Press Release to be mailed to thousands of obstetricians

On August 18, 2004, shortly after initiating one of the Provider Lawsuits in the Central District of California against CureSource, Inc , and twelve physicians, PharmaStem sent a letter to the defendant physicians, offering to "settle" with them by agreeing not to enforce any of PharmaStem's five patents against them, provided the doctors would agree (1) not to collect cord blood or provide any service "in connection with" any of the private cord blood banks not licensed by PharmaStem, and (2) agree not to market or offer any service of the defendant cord blood banking companies   A copy of one of these letters, dated August 18, 2004, with the proposed agreement, is attached hereto as Exhibit 4

On or about August 20, 2004, PharmaStem again sent thousands of letters, containing the same type of misleading statements, to physicians whom it had not sued   These letters informed the recipients of PharmaStem's "recent lawsuits filed across the United States against obstetricians who continue to collect cord blood or market services, including distribution of

---

*Inc  v  ViaCell, Inc., Obstetrical and Gynecological Associates, P.A., Fempartners, Inc ,*
*and Caritas St  Elizabeth's Medical Center of Boston, Inc , C A  No  04-11673 (RWZ)*
*(D  Mass )*

literature, for      ViaCord, CBR (Cord Blood Registry), Cyro-Cell, Corcell and CureSource "

PharmaStem also asserted (emphasis added):

> It is PharmaStem's position, as asserted in the recent lawsuits, that <u>obstetricians are liable for patent infringement if they collect cord blood or market services for unlicensed cord blood banks</u>

A copy of one of these letters is attached hereto as Exhibit 5  Attached to these letters was the so-called "Amnesty Agreement," discussed further below (attached as Exhibit 6)

On or about September 14, 2004, PharmaStem sent another letter to obstetricians  This letter purported to be a settlement communication, but actually was a thinly-veiled attempt to bully and threaten obstetricians into joining PharmaStem's boycott  In this letter, PharmaStem threatened the doctors it had sued with "considerable time, expense, intrusion, and other inevitable tangible and intangible costs" if the doctors refused to settle  As with PharmaStem's other letters, this letter conditioned settlement on the doctors' agreeing to the same overbroad requirement "to collect <u>only</u> for one of the many cord blood banks already operating under a license from PharmaStem "  (emphasis added)  A sample of this communication is attached hereto as Exhibit 7

PharmaStem issued another misleading press release on or about September 20, 2004, after the Court in the Competitor Litigation issued its Order finding no infringement of the '553 Patent and granting a new trial on infringement of the '681 Patent  The September 20 Press Release mischaracterizes the Court's ruling as well as defendants' positions in the Competitor Litigation  For example, PharmaStem states that <u>defendants</u> had argued that <u>families</u> who bank blood with them could be liable for infringement, and that the Court "agreed with the defendants" in that regard  In fact, the basis for the Court's decision was that the defendants did not sell or offer to sell cord blood  Defendants in the Competitor Litigation did not argue that

6

families are liable for infringing PharmaStem's patents, parents do not sell or offer to sell cord blood, and therefore cannot be liable  A copy of the press release is attached hereto as Exhibit 8

On September 22, 2004, PharmaStem (through its counsel) sent a communication to the American College of Obstetricians and Gynecologists ("ACOG")[3]  The communication states, among other things, that "PharmaStem has filed patent infringement lawsuit against over two dozen physicians who work with the four unlicensed cord blood banks", that the "PharmaStem Amnesty Program has been joined by hundreds of physicians", and that another professional society "has recommended its members join the Amnesty Program as a precautionary measure against being named as a defendant in a lawsuit "  A copy of this communication is attached as Exhibit 9

The Press Release of August 2, 2004, the letters of August 18, August 20, and September 14, 2004, the Press Release of September 20, 2004, and the communication of September 22, 2004 to the ACOG, were disseminated after PharmaStem had already made misrepresentations in the earlier PharmaStem June Letter  As such, they served to confirm and bolster the earlier misrepresentations and to perpetuate and reinforce false impressions about the scope of PharmaStem's patents and the risk of liability in the eyes of obstetricians, other health care providers and the public  The press releases, the letters, and the ACOG communication made no attempt to correct the earlier misrepresentations, to disclose the inaccuracies of the earlier misrepresentations, to accurately disclose the ruling of the Court in the Competitor Litigation, or to accurately describe the scope and limitations of PharmaStem's patents  In the Settlement Agreement, the Amnesty Agreement and the cover letters accompanying them PharmaStem

---

[3]     According to its website, the ACOG has over 46,000 members and is "the nation's leading group of professionals providing health care for women "

7

failed to disclose the limitations on theories of indirect infringement that this Court previously ordered were necessary to avoid deception

Even after reversal of the jury verdicts of infringement, PharmaStem continued to display a statement prominently on its website stating. "On October 29, 2003, a Delaware jury unanimously found that . . ViaCord, CBR (Cord Blood Registry), Cryo-Cell and CorCell had willfully infringed [the '681 and '553] patents." This web page made no reference to the fact that the Court subsequently overturned those verdicts, and was thus misleading PharmaStem refused a request to stop running these statements concerning the overturned jury verdict.[4] *See* Exhibits 10-12. A printout from the web page dated October 5, 2004, is attached hereto as Exhibit 13

**The "Amnesty Agreements"**

PharmaStem used (and is using) the coercive pressure of its misleading statements about obstetricians' potential legal liability, and its new lawsuits and threats of litigation, to bully and intimidate obstetricians into boycotting ViaCell and other private blood banks. PharmaStem is implementing this boycott by means of its so-called "Amnesty Agreements."

PharmaStem included copies of these Amnesty Agreements with the August 20 letter PharmaStem mass mailed to obstetricians across the country. In that letter PharmaStem threatened doctors with legal liability if the doctor did nothing more than collect cord blood. Having made that (baseless) threat, the letter then told doctors:

> In an effort to avoid legal action from PharmaStem relating to its patents, please review and sign the attached Amnesty Agreement.

---

[4]   PharmaStem did not fix this misleading statement on its website under after the Court's remarks during the conference call on October 5, 2004. Moreover, during that conference call, PharmaStem made certain patently false representations to the Court concerning the continued presence of those misleading statements on its website. *See* Letter from Richard D. Kirk to the Court dated October 6, 2004.

8

*See* Exhibit 5

The fundamentals of the proposed "Amnesty Agreement" are as follows. PharmaStem provides a covenant not to sue the signing obstetrician with respect to its'645, '427, and '275 patents (interestingly, not the '681 or '553) In return, the obstetrician ("provider") agrees "<u>not to collect cord blood</u> or market or offer the service of cord blood collection <u>in connection with the unlicensed cord blood banks</u>" – defined as ViaCell, CBR, CryoCell, CorCell (and one additional bank that allegedly has now signed a license) *See* Exhibit 6 (emphasis added).

PharmaStem also has posted the Amnesty Agreements on its website Like the August 20 letter, PharmaStem's website states that obstetricians should sign the Amnesty Agreement "to avoid legal action from PharmaStem relating to its patents ." *See* Exhibit 6, printed from PharmaStem's website on October 4, 2004

### The PharmaStem Patents Do Not Prevent Doctors and Other Healthcare Providers From Collecting Cord Blood and Providing It To ViaCell

As detailed below, PharmaStem is trying to use the threat of its patents to prevent conduct that is not covered by those patents Most fundamentally, through its "Amnesty Agreement" PharmaStem is attempting to secure the agreement of obstetricians and other healthcare providers that they will not "collect cord blood" for ViaCell or other specified private banks However, none of PharmaStem's patents can be used to prevent an obstetrician from "collecting cord blood" and providing it to ViaCell

### A. *The '553 Patent*

Of course, the Court is already very familiar with two of PharmaStem's patents As to the '553 patent, that is a method patent having claims which require several steps. The claims asserted against ViaCell and the other defendants in the Competitor Litigation require, <u>inter alia</u>, that cord blood be (1) cryopreserved and (2) "injected" into a human such that hematopoetic

9

reconstitution occurs  None of the '553 patent claims cover the simple collection of cord blood.

Thus, the only basis on which an obstetrician or healthcare provider could be sued under the '553

would be for indirect infringement – i e , contributory infringement or inducing infringement

As this Court has held, however, there can be no contributory infringement under 35

U.S.C. §271(c) unless the alleged contributory infringer "sold or offered to sell" a "material or

apparatus for use in practicing the patented process " *PharmaStem Therapeutics, Inc v. ViaCell,*

*Inc.*, 2004 WL 2127192, at *6 (D Del Sept. 15, 2004) (Ex. 14)   This Court thus has ruled that a

<u>sale</u> or <u>offer to sell</u> is required, and indeed, has also ruled that sale of a service is not sufficient to

satisfy the statute  *See* Order dated July 2, 2004, p 2, in Civil Action No 02-148 (GMS) (Ex 2)

There is no basis for PharmaStem to assert that <u>any</u> of the health care providers receiving its

August 20 letter sell, or offer to sell, cord blood

Nor can PharmaStem argue that its "Amnesty Agreement" is justified based upon an

assertion that the obstetrician or healthcare provider is "inducing" infringement   First, the

August 20th PharmaStem letter threatening to sue obstetricians unless they entered into the

Amnesty Agreement was sent indiscriminately to over 25,000 obstetricians   This was not a

targeted mailing, and there is absolutely no basis for PharmaStem to believe that these

obstetricians were engaged in inducing infringement   Second, the Amnesty Agreement itself

prohibits the healthcare provider from "collect[ing] cord blood <u>or</u> market[ing] <u>or</u> offer[ing] the

service of cord blood collection     "  Thus, the Amnesty Agreement does <u>not</u> just address

activity which may be related to inducement, it also squarely prevents the mere "collection of

cord blood "

The final point as to the '553 patent, of course, is that this Court recently ordered

judgment for ViaCell (and the other defendants in the Competitor Litigation) on this patent,

holding that they had not contributory infringed it. *PharmaStem*, 2004 WL 2127192, at *6-*8. This ruling is conclusive against PharmaStem and thus there is <u>no basis</u> on which any obstetrician or health care provider providing cord blood to ViaCell or the other blood banks listed in the Amnesty Agreements could be liable under the '553 patent.

    *B.    The '681 Patent*

    PharmaStem's Amnesty Agreements could not be based on, or justified by, the '681 patent either. The '681 patent requires a "cryopreservative," so it is not directly infringed by the collecting physicians. And again, simply collecting cord blood and providing it to a blood bank does not involve a sale or offer to sell of a component (cord blood) of the claimed composition. Once again, PharmaStem has no good faith reason to believe that such a sale or offer to sell is taking place. In addition, the '681 patent contains the limitation that the cord blood collection from a single human being must be "in an amount sufficient to effect hematopoietic reconstitution of a human adult." *PharmaStem*, 2004 WL 2127192, at *4 (Ex. 14). As the Court is aware, ViaCell's position is that PharmaStem failed to prove that <u>any</u> of ViaCell's cord blood units (or those of the other blood banks) meet this limitation, and this Court's post-trial Order indicates, at the least, that a substantial percentage of units do not. Once again, the Amnesty Agreement's blanket prohibition on collecting cord blood for the specified blood banks cannot be justified based on the '681 patent.

11

C.    *The '427 and '645 Patents*[5]

For purposes of this analysis, PharmaStem's additional patents add nothing to its ability to assert that obstetricians or health care providers can be prevented from collecting cord blood. This is because the claims of the '427 and '645 patents are essentially identical to the claims of the '553 patent and the '681 patent.

The '427 Patent

The '427 patent, like the '553, is a method patent. It issued on May 27, 2003, and shares the identical specification with the '553 patent. Claims 1-48 of the '427 patent are virtually identical to the claims of the '553 – in particular, all of those claims require injection into a human being so as to cause hematopoietic reconstitution. With respect to these claims, therefore, no obstetrician or health care provider is a direct infringer. In the absence of a sale or offer to sell the cord blood (and injection, which occurs extremely rarely), collectors of cord blood could not be liable for contributory infringement under this patent.[6]

---

[5]    ViaCell anticipates that PharmaStem will complain that it has filed suit on the '427 Patent in "other courts," as if the existence of PharmaStem's other complaints could somehow disable this Court from addressing the issues raised in this action. The pendency of those other cases is not disabling. ViaCell's antitrust and related claims are properly before this Court. It has jurisdiction, and there is no reason the Court cannot and should not act on ViaCell's requests. Of course, it is not uncommon for parallel cases to exist in the federal courts. Moreover, ViaCell intends to move to have the case pending against it in Massachusetts [*PharmaStem Therapeutics, Inc. v. ViaCell, Inc., Obstetrical and Gynecological Associates, P.A., Fempartners, Inc., and Caritas St. Elizabeth's Medical Center of Boston, Inc.*, C.A. No. 04-11673 (RWZ) (D. Mass.)] consolidated in this Court through the MDL process.

[6]    A comparison of the following claims from the '553 patent and the '427 patent is illustrative:

RLF1-2794838-1

Claims 49-56 of the '427 patent are slightly different than the other claims, in that they do not require the step of injection into a human  However, each of those claims contains the limitation that the cord blood must be cryopreserved, and adds the limitation that the cord blood unit must contain "stem cells" "in an amount sufficient to effect hematopoietic reconstitution of a human adult"  Claims 49-56 thus have essentially the same scope as those of the '681 patent, although they are method claims rather than composition claims  Once again, obstetricians or healthcare providers that merely collect cord blood and provide it to the banks do not perform all the steps of this patent, because they do not add a cryopreservative, and also because they must collect enough cord blood to effect reconstitution of an adult   Since there is no direct infringement of the '427 patent by obstetricians, and since there is absolutely no reason to believe that they sell of offer to sell a material or apparatus for use in practicing the patented process, PharmaStem has no good faith basis for asserting infringement under the '427 patent for the act of collection of cord blood

| Claim 13 – '553 patent | Claim 19 – '427 patent |
|---|---|
| 13  A method for hematopoietic or immune reconstitution of a human comprising: | 19  A method for treating a human patient in need of hematopoietic reconstitution comprising: |
| (a) isolating human neonatal or fetal blood components containing hematopoietic stem cells; | (a) obtaining human neonatal or fetal blood components comprising hematopoietic stem cells derived from the umbilical cord blood or placental blood of a human collected at birth of said human; |
| (b) cryopreserving the blood components;<br>(c) thawing the blood components; and<br>(d) introducing the blood components into a suitable human host,<br>such that the hematopoietic stem cells are viable and can proliferate within the host. | (b) cryopreserving the blood components;<br>(c) thawing the blood components; and<br>(d) introducing the blood components into the human patient so as to provide hematopoietic reconstitution |

13

The '645 Patent

Finally, the '645 patent, which issued on October 8, 2002, is virtually identical to the '681 patent. It expires on the same day, and shares the same specification. Each of the claims of the '645 patent is a composition claim, which requires among other things (1) a cryopreservative, and (2) "stem cells" "in an amount sufficient to effect hematopoietic reconstitution of a human adult." The only difference between the '645 patent claims and '681 patent claims is the addition of a limitation – that the composition also contain a "pharmaceutically acceptable carrier." This limitation in no way changes the analysis described above for the '681 patent. Merely collecting umbilical cord blood and providing it to ViaCell (or the other specified banks) in no way directly infringes this patent, nor could the obstetricians be accused of indirect infringement of this patent.

In sum, there is no basis in any of the PharmaStem patents for the assertion that healthcare providers could be liable simply for collecting cord blood and providing it to ViaCell or the other blood banks targeted for boycott in the Amnesty Agreement.[7] Thus, the Amnesty Agreements' restrictions on doctors' conduct is substantially broader than any restriction resulting from PharmaStem's patents.

**PharmaStem's Wrongful Conduct is Achieving PharmaStem's Illegal Goal**

PharmaStem's unlawful campaign is achieving its intended effect. PharmaStem itself admits that "hundreds of physicians" have signed Amnesty Agreements. *See* Exhibit 9 (ACOG). No fewer than 130 obstetricians have contacted ViaCell and stated that they will no longer

---

[7]    The last patent, the '275 patent, is of even less relevance here. The '275 patent is directed to the collection and preservation of stem cells, but also requires that those cells be "expanded," outside of the human body. PharmaStem has not sued ViaCell or any other blood bank under this patent, because it would not have a basis even for asserting that any direct infringement has occurred. This patent certainly could not be a basis for the restrictions contained in the Amnesty Agreement.

14

collect cord blood for patients who wish to store it with ViaCell. *See* Affidavit of Chris Adams ("Adams Aff.") at ¶ 6. Twelve hospitals have contacted ViaCell with the same message. Adams Aff. at ¶ 7. Of course, ViaCell has no way of knowing how many additional doctors or hospitals have taken the same position but have not told ViaCell.

Additionally, the coercive pressure from PharmaStem is causing other obstetricians to boycott all dealings with ViaCell, even though it is not clear that those obstetricians signed an Amnesty Agreement. Moreover, due to PharmaStem's wrongful threats and deliberate misstatements, obstetricians are continuing their refusal <u>even after learning about this Court's September 15 order reversing the judgment in the prior trial</u>. For example, ViaCell recently received a letter from an obstetrician group stating:

> We are in receipt of a 10-page fax regarding the latest in a long line of documentation regarding the dispute between PharmaStem and ViaCell, among others. While I understand your frustration with the situation, please remove our fax number from your legal updates and other information regarding this conflict. Our fax number is [].
>
> Our attorneys have advised us, after logging several hundred dollars of billable hours, to simple [sic] discontinue using any non-licensed company. We have decided that we need to heed that advise. We understand that you dispute the claims of PharmaStem. We understand that you feel we can continue to use your company without repercussions. However, please realize that our focus is to provide our patients with the best possible care. We also need to protect ourselves when possible from unnecessary legal risk. Hopefully this conflict will be resolved soon.

*See* Exhibit 15 [8] The Florida Obstetric and Gynecological Society has advised obstetricians "to exercise extreme caution" and stated that "[t]hose wishing to insulate themselves from any possible litigation may want to execute the [Amnesty] Agreement." *See* Exhibit 16. Indeed, some obstetricians and/or hospitals have <u>stopped collecting cord blood entirely</u> in response to PharmaStem's tactics. Adams Aff. at ¶ 10.

15

These developments are having a direct adverse effect on ViaCell. Dozens of customers have discontinued collections and storages already scheduled – presumably because their doctors refused to perform the collection. Adams Aff at ¶ 9. Moreover, on a daily basis patients who had planned to use ViaCell are bringing up concerns with their doctors based on PharmaStem's conduct and its potential impact on their ability to preserve their children's cord blood. Adams Aff at ¶ 8.

PharmaStem's conduct also threatens to impose direct and unlawful price increases on the entire private cord blood banking market. Certain of the private blood banks that have signed license agreements with PharmaStem have significantly increased their prices in the past year. Adams Aff at ¶ 12. It is reasonable to assume that at least some portion of the price increase results from the royalties they must pay PharmaStem.[9] Moreover, PharmaStem's licenses require payment of royalties on all blood units. A typical example of PharmaStem's license is attached as Exhibit 18. *See* Patent License Agreement with Geneticas Life Science, Inc at 3 (Ex. 18). As discussed above, many stored blood units do not infringe PharmaStem's patents, thus, PharmaStem is charging royalties on non-infringing blood. Such royalties are improper and anticompetitive, as set out below, and are a direct harm to consumers forced to pay them in the form of higher costs for blood banking services. As PharmaStem's Amnesty Agreements force more patients to bank with companies that have signed the license agreements – and/or succeed in coercing other banks to sign licenses – more consumers will be harmed by paying an overcharge.

---

[8]    The fax mentioned in the letter was sent by ViaCell and discussed, among other things, this Court's decision overturning the judgment in the Competitor Litigation.

[9]    Dr. Steven Kalos, ViaCell's antitrust expert, testified in the Competitor Litigation that the costs of royalties would inevitably be passed on to consumers. Trial Transcript pp. 1991-92 (Ex. 17).

In other words, the exclusionary and anticompetitive effects of the boycott PharmaStem orchestrating against ViaCell are already occurring  Unless the Court intervenes, there is every reason to believe the situation will get worse

## ARGUMENT

**I.     VIACELL IS ENTITLED TO A PRELIMINARY INJUNCTION TO STOP PHARMASTEM'S UNLAWFUL AND ANTICOMPETITIVE CONDUCT IN VIOLATION OF THE SHERMAN ACT**

ViaCell is entitled to a preliminary injunction upon a showing with respect to: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief  *KOS Pharm , Inc  v  Andrx Corp* , 369 F 3d 700, 708 (3rd Cir  2004); *see also Pappan Enterprises, Inc  v  Hardee's Food Sys , Inc* , 143 F 3d 800, 803 (3rd Cir  1998)  All those elements are met here  The Court therefore should grant the preliminary injunction ViaCell requests

### A.     ViaCell Has a Likelihood of Success on the Merits.

ViaCell seeks injunctive relief on its claims that PharmaStem's coerced group boycott violates Section 1 of the Sherman Act, as a threatened (Count II) and an actual (Count IV) unreasonable restraint of trade  Section 16 of the Clayton Act authorizes the Court to grant injunctive relief against actual or threatened violation of the antitrust laws  15 U S C  § 26; *see Cargill, Inc  v  Montfort of Colorado, Inc* , 479 U S  104, 109-111 (1986); *In re Warfarin Sodium Antitrust Litigation*, 214 F 3d 395, 399 (3rd Cir  2000)  Pursuant to Section 16, a preliminary injunction is available upon "a showing that the danger of irreparable loss or damage is immediate " 15 U S C  § 26  The standards that govern issuance of an injunction under Section 16 are the same standards courts apply to requests for injunctive relief in other circumstances 15 U S C  § 26

17

Section 1 of the Sherman Act outlaws "every contract, combination    or conspiracy" that unreasonably restrain trade. 15 U.S.C. § 1; *see Standard Oil v. U.S.*, 221 U.S. 1, 58 (1911) (unreasonable restraints are outlawed). Section 1 scrutinizes agreements between separate entities because "[c]oncerted activity inherently is fraught with anticompetitive risk. It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984). The "essence of the violation" in a Section 1 case resides in the existence of the agreements and their exclusionary purpose. *See Weiss v. York Hosp'l*, 745 F.2d 786, 805 (3rd Cir. 1984). Agreements that unreasonably restrain trade – *i.e.*, that harm consumers without providing any offsetting benefits that justify the harm – are unlawful.

To prevail on its Section 1 claims, ViaCell must show: (1) that PharmaStem has entered into agreements with other parties; (2) that the agreements produce adverse, anticompetitive effects in the relevant market; (3) that the object of and the conduct of PharmaStem's agreements is illegal; and (4) that ViaCell is threatened with injury (Count II) or has been actually injured (Count IV) by PharmaStem's agreements. *See Angelico, M.D. v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 276 (3rd Cir. 1999); *In re Warfarin Sodium Antitrust Litigation*, 214 F.3d at 399. The evidence here supports each of these elements.

### 1    The "Amnesty Agreements" are Agreements under Section 1.

The first element is easily satisfied. A contract or combination for purposes of Section 1 is just an agreement between independent parties. *See Copperweld*, 467 U.S. at 768. The Amnesty Agreements are contracts between independent parties.    Thus, the Amnesty Agreements satisfy the "agreement" element of a Section 1 claim.[10]

---

[10]    That PharmaStem pressures doctors into signing does not alter the conclusion that the Amnesty Agreements are agreements within the meaning of Section 1. *See, e.g., MCM*

18

2.    The Amnesty Agreements Unreasonably Restrain Trade.

The evidence equally supports the second element of ViaCell's Section 1 claim, that the Amnesty Agreements unreasonably restrain trade in the market for private cord blood banking services [11]

PharmaStem's Amnesty Agreements require the signing physician or hospital to "agree[] not to [1] collect cord blood or [2] market or [3] offer the service of cord blood collection in connection with the unlicensed cord blood banks listed below". The Amnesty Agreements then list ViaCell and the other private cord blood banks that have refused to accept PharmaStem's wrongful licenses  See Exhibit 6.  As discussed above, by requiring the hospitals or physicians to agree to a blanket refusal to deal with ViaCell and other listed private cord blood banks, PharmaStem's Amnesty Agreements go substantially beyond any legitimate right to exclude arising from PharmaStem's patents. The Amnesty Agreements improperly prevent hospitals and doctors from performing services in connection with ViaCell and other private cord blood banks that do not infringe any claim in any of PharmaStem's patents

These agreements, and the coerced boycott they implement, are prototypical antitrust violations  The characteristics of illegal boycotts that violate the antitrust laws include (a) "denial of something a competitor needs to compete effectively" and (b) "the absence of any plausible contention that the challenged behavior would 'enhance overall efficiency and make markets more competitive '"  See Rossi v. Standard Roofing, Inc., 156 F 3d 452, 463 (3rd Cir.

---

Partners, Inc. v. Andrews-Bartlett & Assoc., Inc., 62 F 3d 967, 973 (7th Cir. 1995) ("the 'combination or conspiracy' element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion") (collecting cases), C&W Constr. Co. v. Brotherhood of Carpenters and Joiners of Am., Local 745, 687 F Supp. 1453, 1462-63 (D Haw 1988) (suppliers coerced by labor union to refuse to deal with the plaintiff were co-conspirators under Section 1)

19

1998) (quoting Areeda & Hovenkamp, Antitrust Law ¶ 1510). As stated by the Supreme Court, illegal boycotts under the Sherman Act include those in which the defendant's conduct involves "persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Northwest Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co.*, 472 U.S. 284, 294 (1985). That is precisely what PharmaStem is doing here: coercing doctors and hospitals into refusing to collect cord blood for families to store at ViaCell or other private banks. There can be no argument that this conduct enhances efficiency. It is solely and purely exclusionary.

The anticompetitive effects that result from a series of agreements with suppliers that cut off products to competitors, where the products cannot be obtained elsewhere, are well recognized. *See, e.g., Toys "R" Us v. FTC*, 221 F.3d 928 (7th Cir. 2000) (series of agreements between Toys "R" Us and toy manufacturers requiring them not to sell to discount stores violates antitrust laws). The series of agreements between PharmaStem and health care providers have produced, and/or threaten to produce, the same type of anticompetitive effects. Private blood banks only get cord blood from patients whose doctors have collected it for them; the blood banks cannot obtain that blood if the doctors refuse. The Amnesty Agreements were specifically designed to cut off that source, and they are already having that effect.

PharmaStem cannot justify the Amnesty Agreements on the grounds that those agreements purport to settle PharmaStem's actual or threatened litigation against doctors. The Amnesty Agreements are far broader than any viable, good faith claim of infringement. The antitrust violation resides precisely in this overbreadth and is not cured simply by being in a

---

[11]    The relevant market in which to assess the competitive effects of PharmaStem's conduct is the market for the provision of private cord blood banking services in the United States. *See* trial testimony of Dr. Steven Kalos in the Competitor Litigation, pp. 1985-1989

settlement agreement.  *See, e.g., In re K-Dur Antitrust Litigation*, ___ F Supp 2d ___, 2004 WL 2203844, at *10 (D N J Sept 29, 2004) (Ex. 19) (upholding validity of Section 1 claim alleging that settlement agreement unreasonably restrained trade because, among other things, its restrictions went beyond the patent at issue and applied to non-infringing products).  The agreements restrict the doctors from performing non-infringing services, including the collection of cord blood for families to store at ViaCell.  Such sweeping restrictions are not necessary to settle PharmaStem's claims (assuming it has any good faith claims to begin with), and they unduly restrict competition.

PharmaStem admits that it has already signed 80% of the private blood banks to its wrongful licenses.  *See* Exhibit 20.  If the boycott is allowed to continue and expand, the economic pressure it imposes may well force the remaining private banks to do the same – exactly as PharmaStem intends.  Inevitably, the royalties PharmaStem charges will be passed on to families, who will be forced to pay supracompetitive prices for cord blood banking services.  *See* footnote 10, *supra*.  Moreover, as a result of the confusion and concern generated by PharmaStem's conduct, certain obstetricians and hospitals have simply stopped collecting cord blood entirely, as discussed above.  Families therefore are being deprived – irreparably – of the chance to collect this potentially life-saving resource.

The evidence thus shows that ViaCell has a likelihood of establishing that the Amnesty Agreements unreasonably restrain trade, the second element of its Section 1 claims.

### 3.     The Object and Conduct of PharmaStem's Coerced Boycott is Illegal.

The third element of ViaCell's Section 1 claim – that the object of PharmaStem's conduct is illegal – is just as easily satisfied.  The goal of PharmaStem's coerced boycott is to force all private blood banks – including ViaCell – to sign a license agreement with PharmaStem.  PharmaStem requires its licensees to pay royalties for all cord blood units they preserve.  As

21

discussed above, this would require ViaCell and others to pay royalties to PharmaStem for non-infringing conduct    Thus, PharmaStem's license agreements are overbroad, unlawful, and anticompetitive

The Supreme Court has repeatedly affirmed and enforced "the principle that a patentee may not use the power of his patent to levy a charge for making, using, or selling products not within the reach of the monopoly granted by the Government " *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U S 100, 136-37 (1969)    "In a long and consistent line of cases the Court has held that an owner of a patent may not condition a license so as to tie to the use of the patent the use of other materials, processes or devices which lie outside the monopoly of the patent " *Transparent-Wrap Mach. Corp v. Stokes & Smith Co.*, 329 U S 637, 640 (1947); *see also Mercoid Corp. v. Mid-Continent Inv. Co* , 320 U S 661, 664 (1944); *Ethyl Gasoline Corp. v. United States*, 309 U S 436, 456 (1940)    PharmaStem's license agreements directly violate this rule, by requiring a licensee to pay royalties for non-infringing conduct

The law therefore forbids PharmaStem from using contracts (here, the Amnesty Agreements) to gain exclusivity that its patents do not confer    As stated by the Supreme Court in *Transparent-Wrap*,

> He who uses his patent to obtain protection from competition in the sale of unpatented materials extends by contract his patent monopoly to articles as respects which the law sanctions neither monopolies nor restraints of trade.

*Transparent-Wrap*, 329 U S at 644; *accord Leitch Mfg. Co v. Barber Co.*, 302 U S 458, 463 (1938) ("every use of a patent as a means of obtaining a limited monopoly of unpatented material is prohibited"), *Mercoid*, 320 U S at 666-67 (where "the patent is employed to protect the market for a device on which no patent has been granted      [s]uch a vast power 'to multiply monopolies' at the will of the patentee     would carve out exceptions to the anti-trust laws which Congress has not sanctioned "), *U.S. v. Masonite Corp.*, 316 U S 265, 277 (1942) ("The

22

owner of a patent cannot extend this statutory grant by contract or agreement  A patent affords no immunity for a monopoly not plainly within the grant ")  Such conduct constitutes both patent misuse and, in appropriate cases (such as this one), an antitrust violation. *See, e g , Zenith Radio*, 395 U S  at 140; *In re K-Dur Antitrust Litigation*, __ F Supp 2d __, 2004 WL 2203844, at *10 (Ex  19)

ViaCell therefore has a likelihood of establishing that PharmaStem's Amnesty Agreements and its broader campaign serves an illegal purpose which is anticompetitive

    4    <u>Injury to ViaCell from PharmaStem's Coerced Boycott.</u>

ViaCell undoubtedly has standing to seek relief under the antitrust laws from PharmaStem's illegal conduct targeted directly at it  PharmaStem's illegal conduct threatens to injure, and is injuring, ViaCell  The Clayton Act explicitly authorizes ViaCell to maintain this lawsuit  Specifically, Section 4 of the Clayton Act authorizes a suit for damages by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," and Section 16 authorizes a suit for injunctive relief by any person "against threatened loss or damage by a violation of the antitrust laws "  15 U S C  §§ 15, 26; *see In re Warfarin Sodium Antitrust Litigation*, 214 F 3d at 399  ViaCell meets the requirements of both sections: it has been injured by PharmaStem's conduct, and it faces a significant threat of injury from that conduct  That injury (and threatened injury) includes, but is not limited to, loss of goodwill, loss of market, loss of business, loss of customers, and lost profits

Moreover, ViaCell clearly satisfies the prudential requirements for antitrust standing and is a proper plaintiff to bring this lawsuit  Antitrust standing analysis focuses on "the nexus between the antitrust violation and the plaintiff's harm" and "whether the harm alleged is of the type for which Congress provides a remedy"  *Angelico*, 184 F 3d at 274; *In re Lower Lake Erie*

*Iron Ore Antitrust Litigation*, 998 F 2d 1144, 1163 n 9 (3rd Cir 1993) The Third Circuit looks

at five factors to evaluate antitrust standing under Section 4 of the Clayton Act:

> (1) the causal connection between the antitrust violation and the harm to the
> plaintiff and the intent by the defendant to cause that harm, with neither factor
> alone conferring standing, (2) whether the plaintiff's alleged injury is of the type
> for which the antitrust laws were intended to provide redress; (3) the directness of
> the injury, which addresses the concern that liberal application of standing
> principles might produce speculative claims; (4) the existence of more direct
> victims of the alleged antitrust violations; and (5) the potential for duplicative
> recovery or complex apportionment of damages

*Angelico*, 184 F 3d at 274 (holding that doctor denied medical privileges as a result of alleged

conspiracy between hospitals had antitrust standing) ; *In re Lower Lake Erie*, 998 F 2d at 1165-

66 (holding that steel companies injury by conspiracy among railroad companies had antitrust

standing) The analysis under Section 16 "is not as demanding, but it does require a showing

that there is 'a significant threat of injury from [a]    violation of the antitrust laws    '" *In re*

*Warfarin*, 214 F 3d at 399, quoting *Zenith Radio*, 395 U S at 130

ViaCell plainly satisfies the antitrust standing requirement:

<u>Factor 1</u>  ViaCell's harm is causally connected to the boycott PharmaStem has organized

against it – indeed ViaCell is the <u>express target </u>of the Amnesty Agreements  PharmaStem's

clear intent was to harm ViaCell by having doctors refuse to collect cord blood for patients who

wish to store it at ViaCell

<u>Factor 2</u>  ViaCell's injury as the target of an illegal boycott, which will have the effect of

harming consumers, is the type of injury that antitrust laws were designed to redress, for at least

two reasons  First, the boycott threatens to reduce output or increase prices, a classic form of

antitrust injury  *See Angelico*, 184 F 3d at 276  Second, the exclusion ViaCell suffers from the

boycott puts families to a Hobson's choice. either delivering with their doctor of choice but

forfeiting their cord blood bank of choice (or not having it collected at all), or forfeiting their

24

doctor of choice and moving to a different doctor who has not signed an Amnesty Agreement so the cord blood can be collected and stored at ViaCell  That restriction of consumer choice is anticompetitive and constitutes antitrust injury  *See Blue Shield of Virginia v. McCready*, 457 U S  465, 483 (1982); *Glen Holly Entertainment, Inc. v. Tektronix Inc.*, 343 F 3d 1000, 1011 (9th Cir  2003) ("One form of antitrust injury is '[c]oercive activity that prevents its victims from making free choices between market alternatives '")

Factor 3   The injury – and the threatened injury – to ViaCell from the Amnesty Agreements is direct and substantial

Factor 4  There are no more direct victims of the Amnesty Agreements than ViaCell and the other targeted blood banks explicitly listed in the Amnesty Agreements  While consumers also are victims, their injury arises indirectly from the injury to the blood banks  *See, e.g.*, *McCready*, 457 U S  at 483  Also, consumers likely will only suffer injury once, and they may be less likely to sue than ViaCell  *See, e.g., Angelico*, 184 F 3d at 275  In any event, the possibility that consumers might sue does not deprive ViaCell of antitrust standing   *See McCready*, 457 U S  at 483

Factor 5   ViaCell's damages claim is neither duplicative nor complex  It is not duplicative, because ViaCell's injury results directly from the exclusionary effect of PharmaStem's conduct  Further, ViaCell's injuries from exclusion are distinct from the injuries of consumers forced (by PharmaStem's same exclusionary conduct) to overpay by going to a different blood bank that has signed a license with PharmaStem

For all these reasons, ViaCell is a proper plaintiff and is entitled to assert its claims for relief under the antitrust laws

25

The foregoing demonstrates that ViaCell has a likelihood – indeed, a strong likelihood – of prevailing on its Section 1 claims against PharmaStem. Thus, ViaCell has satisfied the first element for granting the preliminary injunction it requests.

### B. ViaCell Has Suffered And Continues To Suffer Irreparable Harm As A Result Of PharmaStem's Boycott Campaign

The second showing required for entry of a preliminary injunction is irreparable harm. That element, too, is satisfied here. "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." *Pappan*, 143 F.3d at 805, *citing Opticians Ass'n of Am. v. Independent Opticians of Am.*, 968 F.2d 187, 195 (3rd Cir. 1990). Loss of market share also constitutes irreparable harm. *Novartis Consumer Health, Inc. v. Johnson & Johnson*, 290 F.3d 578, 596 (3rd Cir. 2002). Those are the very harms ViaCell is threatened with and is already suffering.

As a direct and proximate result of PharmaStem's Amnesty Agreements, ViaCell has lost business and is threatened with continuing loss of business from families who otherwise would store cord blood with ViaCell. In the past few weeks alone, no fewer than five hospitals and 80 physicians have informed ViaCell that they will no longer collect cord blood for patients to supply to ViaCell for preservation. Numerous customers of ViaCell have also discontinued their plans to store blood at ViaCell because their doctors refused to perform the collection. ViaCell is also losing market share as a direct result of PharmaStem's unlawful conduct. Adams Aff. ¶ 11.

ViaCell's inability to meet customer desires and expectations – through no fault of its own, but only as a consequence of PharmaStem's unlawful conduct – inevitably damages ViaCell's reputation and goodwill in the market. ViaCell's goodwill and reputation are equally harmed by health care providers' refusal to collect blood for them. Moreover, as a result of the

26

Amnesty Agreements, ViaCell is being significantly foreclosed from access to cord blood, a necessary input to its business of providing private cord blood banking services  These injuries are quintessential examples of irreparable harm  They provide a compelling reason for the Court to intervene now by preliminary injunction

### C.    The Public Will Be Irreparably Harmed If PharmaStem Is Permitted To Continue Its Boycott Campaign

The public also has already been harmed, and will continue to be harmed, if PharmaStem is permitted to continue its boycott campaign  Certain obstetricians and hospitals are refusing to collect any umbilical cord blood, regardless of the bank where it will be stored, as a result of PharmaStem's conduct   Once the opportunity to collect cord blood at the time of birth is foregone or lost, it can never be recovered  Patients of such doctors who otherwise would collect and preserve umbilical cord blood suffer clear and irreparable harm

In addition, as discussed above, at least some private cord blood banks that have entered into licenses with PharmaStem have raised the prices they charge to customers for storing cord blood  Adams Aff ¶ 12  Most or all of the remaining private banks that have signed licenses are likely to raise their prices as well because of the costs to the banks of the royalty payments. Because PharmaStem charges royalties even for non-infringing blood units, some or all of the royalty fees PharmaStem is charging to private cord blood banks, and some or all of the resulting increase in prices that private cord blood banks charge to families for storage services, constitutes an anticompetitive overcharge   If PharmaStem succeeds through its wrongful Amnesty Agreements in forcing ViaCell or the other remaining unlicensed private cord blood banks to accept PharmaStem's wrongful license, or alternatively drives those companies out of the market, families will be left with no choice but to store their blood with a private bank that is required to pay royalty fees to PharmaStem  As a result, families will have no choice but to pay

27

supracompetitive prices for private cord blood banking services as a result of the anticompetitive overcharge created by PharmaStem's wrongful licenses.

Further, also as discussed above, families are being deprived for no good reason of their right to select <u>both</u> their preferred doctor to deliver their child <u>and</u> their preferred blood bank to store that child's cord blood  PharmaStem's conduct therefore imposes unreasonable restraints on patient choice at a particularly intimate moment in a family's life  The harm is irreparable, because there is no way to undo the loss of parents' ability to make what they deem to be the appropriate medical decisions for themselves and their children

### D.     Balancing The Equities

Any harm PharmaStem might potentially suffer if the injunctive relief sought by ViaCell is granted is significantly outweighed by the irreparable harm PharmaStem's anticompetitive conduct has caused and continues to cause ViaCell and the public  As the testimony in the Competitor Litigation established, PharmaStem's business is acting as the assignee of various patents through licensing and litigation  *See* Testimony of Nicholas Didier in the Competitor Litigation, pp  at 756-57 (Ex  21)  As a result, there can be no doubt that any harm PharmaStem might suffer can be compensated monetarily

In contrast, ViaCell's stake is not only its goodwill, reputation, and market share, but the very existence of its market  With each week that goes by, ViaCell is losing customers and access to cord blood  PharmaStem's goal is to continue its anticompetitive conduct until all firms who resist entering into PharmaStem's illegal and overbroad license have been removed from the market – or accede to its wrongful license  Moreover, PharmaStem's conduct has resulted in situations where parents have been denied the once-in-a-lifetime opportunity to collect their child's cord blood  The loss these parents have suffered can never be compensated

As a result, balancing the equities here clearly dictated granting ViaCell the injunctive relief it seeks

## II.    VIACELL ALSO IS ENTITLED TO A PRELIMINARY INJUNCTION UNDER MASS. GEN. LAWS CHAPTER 93A TO STOP PHARMASTEM'S UNFAIR AND DECEPTIVE TRADE ACTS AND PRACTICES

ViaCell also is entitled to preliminary injunctive relief based upon its claim under Massachusetts Gen Law Ch 93A ("Chapter 93A") Chapter 93A, the Massachusetts unfair and deceptive trade practices act, prohibits "engag[ing] in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice." Mass. Gen Law 93A §11 PharmaStem's behavior, as detailed above, has surely violated Chapter 93A

Chapter 93A is a much litigated statute, with a well developed body of case law Chapter 93A applies to PharmaStem's conduct with respect to ViaCell, because ViaCell is a Massachusetts-based company and thus PharmaStem's conduct has been specifically directed at a Massachusetts based company, seeking a boycott of that company's services The conduct that PharmaStem has targeted has taken place in Massachusetts, and the harms from PharmaStem's conduct have been felt in Massachusetts Under traditional conflict of law rules, Ch 93A applies to PharmaStem's conduct as to ViaCell, and this court can and should apply Ch 93A to PharmaStem's conduct See Popkin v. National Ben. Life Ins. Co., 711 F Supp 1194, 1199-1202 (S D N Y 1989) (applying New York choice of law rules to find that Chapter 93A applied to plaintiff's claims, denying summary judgment)

Certain aspects of Chapter 93A law are well established:

1.    Chapter 93A is not limited to consumer protection claims Instead, Chapter 93A applies as well to commercial conduct between businesses. Thus, Chapter 93A expressly applies to commercial disputes, such as the one at hand See Mass Gen Law 93A, §11 ("**Any person who engages in the conduct of any trade or commerce** and who suffers any loss of money or property, real or personal, as a result of the use or employment by **another person who engages in any trade or commerce** of an unfair method of competition or an unfair or deceptive act or

29

practice declared unlawful may bring an action") (emphasis added); *Massachusetts Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc.*, 403 Mass 722, 532 N.E.2d 660, 664 (1989) ("General Laws c. 93A §§ 2 and 11 , make unlawful 'unfair or deceptive acts or practices in the conduct of any trade or commerce' between two businesses.")

2      The "unfair and deceptive practices" and "unfair methods of competition" prohibited by Ch. 93A have been very broadly construed in the Massachusetts courts. The courts have stated, repeatedly and expressly, that Chapter 93A is not limited to protecting against violations of duties established at common law, and instead applies to any and all commercial activities that are "unfair" or "deceptive." *See, e.g., Kensallis Finance Ltd. v. Fern*, 421 Mass. 659, 671 N.E.2d 731 (1996). For example, the Massachusetts Supreme Judicial Court has stated that Ch. 93A prohibits practices that are "immoral, unethical, oppressive, or unscrupulous." *PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975). Another oft-quoted standard is that Chapter 93A prohibits conduct which "would raise the eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 N.E.2d 149, 153 (1979). Thus, Chapter 93A "embrace[s] causes of action for which there are no common-law analogues." *Nei v. Burley*, 388 Mass. 307, 313, 446 N.E.2d 674 (1983).

3      Injunctive relief is available under Ch. 93A. The statute is express about this, and injunctive relief is often granted in Ch. 93A actions. Mass. Gen. Law 93A, §11 (Plaintiff "may, , bring an action for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper."), *see e.g., Jillian's Billiard Club of Am. v. Beloff Billiards, Inc.*, 35 Mass. App. Ct. 372, 619 N.E.2d 635, 639 (1993); *Brandt v. Olympic Constr., Inc.*, 16 Mass. App. Ct. 913, 449 N.E.2d 1231, 1234 (1983).

Here, PharmaStem's conduct clearly meets the above standards for "unfair and deceptive practices" and "unfair methods of competition." As detailed above, PharmaStem's actions have been and continue to be "deceptive." PharmaStem misstated the court's verdict, and then built on that misstatement by stating to obstetricians, without any good faith basis, that they can be liable simply for the collection of cord blood. This conduct has been intended to deceive, and in fact has deceived, those obstetricians. *See Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 396 N.E.2d 149, 154 (1979) (misrepresentations form basis for a claim under Chapter 93A). PharmaStem's same actions have been "unfair" and coercive, in that they have caused many obstetricians to take actions –such as signing the "Amnesty Agreement," and/or refusing to do

30

business with defendants – which PharmaStem could not obtain by simply enforcing its patents Indeed, PharmaStem's coordinated campaign is a classic example of an unfair business practice, and one which can and should be remedied by Mass Gen Laws Ch 93A  *See Massachusetts Sch of Law at Andover v Am Bar Ass'n*, 952 F Supp 884, 890-91 (D Mass 1997), *aff'd* 142 F 3d 26 (1st Cir 1998) ("c 93A prohibits unfair methods of competition including disparaging the services or business of a competitor by a false or misleading representation of facts "), *Piccutio v Dwyer*, 32 Mass App Ct 137, 586 N E 2d 38, 40 (1992) (holding that interference with contract done with "improper purpose or improper means certainly falls far below the acceptable level of fair dealing that c 93A was designed to promote and easily attains the 'level of rascality' giving rise to an action under the statute ")

ViaCell therefore has a likelihood of succeeding on its claim against PharmaStem under Chapter 93A as well  Moreover, as set out above, ViaCell also satisfies the remaining three elements for entry of a preliminary injunction  This forms an independent basis for granting injunctive relief

## CONCLUSION

In short, this is an extraordinary matter, and extraordinary relief is required  By its unlawful and coercive tactics, PharmaStem has managed to leverage a verdict which no longer exists into significant, continuing, irreparable harm to ViaCell  The Amnesty Agreements are unlawful restraints of trade, and this Court should not let the boycott they impose continue or widen  PharmaStem has also shown its contempt for the law, and for this Court's orders  Not once in its multitude of communications with obstetricians has PharmaStem referenced the Court's July 1 Order, or the limitations on contributory infringement that the court detailed in that July 1 Order  Significant corrective action is required  As result, ViaCell seek a preliminary injunction against PharmaStem, in the form attached

31

Dated: October 8, 2004

Jeffrey L. Moyer, Esq. (#3309)
Alyssa M. Schwartz (#4351)
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19899
(302) 651-7700
Attorneys for ViaCell, Inc

*Of Counsel*:
Paul F. Ware, Jr., P.C.
John C. Englander, Esq.
James C. Rehnquist, Esq.
Elaine Herrmann Blais, Esq.
Christopher T. Holding, Esq.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109

RLF1-2794838-1

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on October 8, 2004, I caused true and correct copies of the foregoing motion to be served upon the following counsel of record:

**BY FEDERAL EXPRESS:**

Paul J Andre, Esq
Lisa Kobialka, Esq
Perkins Coie LLP
101 Jefferson Drive
Menlo Park, CA 94025

**BY HAND DELIVERY:**

Pharmastem Therapeutics, Inc
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE   19801

Philip A Rovner, Esq
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street
Suite 600
Wilmington, DE 19801

Alyssa M Schwartz (#4351)