IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VIACELL INC , CRYO-CELL INTERNATIONAL, INC and CORCELL, INC      ) ) ) ) | |
|      Plaintiffs,      ) ) | Civil Action No 04-1335-GMS |
|      v      ) ) ) | **JURY TRIAL DEMANDED** |
| PHARMASTEM THERAPEUTICS, INC ,      ) ) | |
|      Defendant      ) | |

## AMENDED COMPLAINT

## INTRODUCTION

1     This case involves an unlawful, anticompetitive, and deceptive campaign by defendant PharmaStem Therapeutics, Inc ("PharmaStem") to unreasonably restrain trade in and to monopolize the market for private cord blood banking in the United States  Through a series of wrongful and exclusionary agreements and actions, PharmaStem is seeking to coerce a boycott by health care providers of plaintiffs ViaCell Inc ("ViaCell"), Cryo-Cell International, Inc ("Cryo-Cell"), CorCell, Inc ("CorCell") and other providers of private cord blood banking services  PharmaStem's goal is to force private cord blood banks to accept unnecessary and overbroad licenses to certain PharmaStem patents, which would require the companies to pay royalties to PharmaStem even for non-infringing conduct  Unless stopped, the inevitable result of PharmaStem's conduct is that consumers – the families of newborn infants – will be improperly required to pay higher prices for private cord blood banking services  Further, many families are being, and will be, deprived of the once-in-a-lifetime opportunity to preserve cord blood as a result of PharmaStem's actions

1

Exhibit D

2.    PharmaStem's wrongful and anticompetitive campaign involves two steps First, PharmaStem has repeatedly and improperly asserted, and continues to assert, that any collection of cord blood by obstetricians or hospitals infringes its patents. That blanket assertion of infringement is demonstrably false, misleading, and objectively unreasonable, as PharmaStem itself knows. PharmaStem's patents are subject to significant limits. As a result, obstetricians and hospitals simply cannot incur liability under PharmaStem's patents merely by collecting umbilical cord blood. Nonetheless, PharmaStem has sued numerous hospital and doctors (not to mention private cord blood banks) for patent infringement. In addition, PharmaStem has repeatedly made false and misleading public statements about its patents. This Court has already ruled that statements by PharmaStem in this regard were false and misleading, and enjoined PharmaStem from making false and misleading statements to obstetricians in the future. In defiance of the Court's order, PharmaStem has sent letters to literally tens of thousands of doctors that contain inaccurate, false, and misleading assertions of patent infringement against the doctors related to private cord blood banking. This conduct itself is wrongful, exclusionary, and deceptive, and is part of PharmaStem's overall anticompetitive scheme.

3.    Second, after making its unsupportable infringement allegations and public misstatements, PharmaStem presented doctors or hospitals with what is called an "Amnesty Agreement." In these wrongful agreements, PharmaStem agrees to drop all charges and/or not to file suit if the doctor or hospital agrees to a complete boycott of any private cord blood bank that has not signed one of PharmaStem's wrongful licenses. The terms of these "Amnesty Agreements," and the boycotts they impose, are far broader than any legitimate right to exclude PharmaStem may have from its patents. For example, the "Amnesty Agreements" purport to

2

prohibit the mere collection of blood, but no claim of any PharmaStem patent is directly or indirectly infringed by mere collection. Thus, the "Amnesty Agreements" would prohibit doctors and hospitals from engaging in a broad array of <u>non-infringing</u> conduct. PharmaStem is actively working to execute such agreements with literally tens of thousands of doctors. The "Amnesty Agreements" are wrongful and anticompetitive, both on their own and as part of PharmaStem's overall anticompetitive scheme.

4.      PharmaStem has wrongfully coerced numerous hospitals and physicians into signing "Amnesty Agreements" and boycotting private cord blood banks that have refused to enter into PharmaStem's wrongful licenses. On information and belief, additional doctors and/or hospitals are signing and will sign PharmaStem's wrongful "Amnesty Agreements" rather than subject themselves to the costs and burdens of PharmaStem's wrongful tactics. The doctors are susceptible to PharmaStem's pressure tactics, because they generally have no vested interest in working with any particular blood bank. Some hospitals and obstetricians have simply ordered their staffs not to collect cord blood at all, regardless of which cord blood banks will be used, to avoid the risk of litigation with PharmaStem. This is adversely affecting patients' ability to collect and store cord blood – an opportunity that, once lost, can never be recovered.

5.      ViaCell, Cryo-Cell and CorCell are private cord blood banks that provide a range of services to customers. ViaCell, Cryo-Cell and CorCell have successfully defended against patent infringement claims by PharmaStem. This Court recently ruled that ViaCell, Cryo-Cell and CorCell do not infringe one of PharmaStem's patents (the '553 patent) as a matter of law, and it granted a new trial on infringement with respect to another of PharmaStem's patents (the '681 patent), while affirming the limitations on the '681 patent

3

PharmaStem's anticompetitive conduct directly targets ViaCell, Cryo-Cell and CorCell. Among other things, PharmaStem explicitly lists ViaCell, Cryo-Cell and CorCell in its "Amnesty Agreements" as entities to be boycotted.

6    In the past few weeks, obstetricians and hospitals have contacted ViaCell, Cryo-Cell and CorCell to state that they will no longer collect blood for patients to be stored with ViaCell, Cryo-Cell and CorCell. These effects are already irreparably harming the business of ViaCell, Cryo-Cell and CorCell. If PharmaStem's conduct continues unchecked, the situation threatens to get worse.

7    PharmaStem's conduct is having a market-wide impact. At least 16 private cord blood banks allegedly have already signed license agreements with PharmaStem. As a consequence, companies have raised their prices because of the royalties they must pay to PharmaStem under the wrongful licenses. There are only four remaining private banks that have not succumbed to PharmaStem's tactics, and PharmaStem continues to target them aggressively with its unlawful conduct. Thus, consumers of private cord blood banking services are currently, or soon likely will be, paying more for those services than they would pay in the absence of PharmaStem's wrongful conduct.

8    ViaCell, Cryo-Cell and CorCell bring this action under the federal antitrust laws, 15 U.S.C. § 1 *et seq.*, the federal Lanham Act, 15 U.S.C. § 1125 *et seq.*, and various state laws. PharmaStem's conduct threatens to unreasonably restrain trade, and threatens to lead to a wrongful monopoly, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, unless PharmaStem is enjoined. ViaCell, Cryo-Cell and CorCell request that the Court grant a preliminary and a permanent injunction enjoining PharmaStem's ongoing anticompetitive conduct, including but not limited to preventing the enforcement of the so-called "Amnesty

4

Agreements," preventing PharmaStem from entering into any further such agreements, pursuant to Section 16 of the Clayton Act, 15 U S C  § 26, and voiding the agreements already signed ViaCell, Cryo-Cell and CorCell also seek damages for the losses they have suffered from PharmaStem's wrongful, anticompetitive, and deceptive conduct in violation of Sections 1 and 2 of the Sherman Act under Section 4 of the Clayton Act, 15 U S C  § 15, in violation of Section 43(a) of the Lanham Act, 15 U S C  § 1125(a), and in violation of state law

## PARTIES

9      Plaintiff ViaCell, Inc  ("ViaCell") is a Delaware corporation with a principal place of business located 245 First Street, Cambridge, Massachusetts 02142

10      ViaCell, through its subsidiary ViaCord, provides private blood banking services for families that wish to preserve umbilical cord blood units ("cord blood") following the birth of a child  If a family elects to do so, cord blood is collected at the time of birth by physicians  The blood is then transported to ViaCell for testing and storage  Because cord blood generally contains stem cells, cord blood can potentially be useful for treating certain diseases if they arise in the future   Different cord blood units contain differing amounts of stem cells  Depending on the amount of stem cells in a particular unit, it may or may not prove therapeutically useful

11      All of ViaCell's cord blood banking business is conducted through its facilities in Massachusetts   ViaCell's call center for cord blood banking is located in Massachusetts  Agreements between ViaCell and customers relating to cord blood banking are executed in Massachusetts, and those agreements contain a choice-of-law provision specifying that Massachusetts law governs

12      Plaintiff Cryo-Cell is a Delaware corporation with its principal place of business at 3165 N  McMullen Booth Road, Clearwater, Florida 33761

5

13.     Plaintiff CorCell is a Delaware corporation with its principal place of business located at 1411 Walnut Street, Philadelphia, Pennsylvania 19103. CorCell provides private blood banking services for families that wish to preserve umbilical cord blood units following the birth of a child

14      Defendant PharmaStem Therapeutics, Inc ("PharmaStem") is a Delaware corporation with a principal place of business located in Larchmont, New York 10538.

### JURISDICTION AND VENUE

15      The Court has jurisdiction over ViaCell's federal claims pursuant to 28 U.S.C § 1331, 15 U.S.C. § 1 *et seq*, 15 U.S.C. § 1125 *et seq*, and of ViaCell's state-law claims pursuant to 28 U.S.C § 1367

16      Venue is proper in this judicial district pursuant to 28 U.S.C § 1391 and 15 U.S.C. §§ 15 and 22 as a district in which the defendant resides, may be found and/or transacts business

### PHARMASTEM'S PATENTS AND THE PRIOR COMPETITOR LITIGATION

17      On information and belief, PharmaStem is the assignee of five patents relating to cord blood banking (collectively "PharmaStem's patents"). Those patents are U.S. Patent No 5,004,681 (the "'681 Patent"), U.S. Patent No. 5,192,553 (the "'553 Patent"), U.S. Patent No 6,461,645 (the "'645 Patent"), U.S. Patent No. 6,569,427 (the "'427 Patent"), and U.S. Patent No. 6,605, 275 (the "'275 Patent")

18      Individually and collectively, PharmaStem's patents do not apply to the preservation of all cord blood or to all actions taken in connection with the collection and preservation of cord blood. Moreover, there is no objectively reasonable, good faith interpretation of PharmaStem's patents which suggests that those patents, individually and collectively, cover the preservation of all cord blood or all actions taken in connection with the

6

collection and preservation of cord blood. Thus, families, health care providers and blood banks can engage in numerous actions with regard to cord blood banking without infringing PharmaStem's patents. For example, no claim of any PharmaStem patent covers the mere collection of cord blood.

19      Hospitals and/or physicians that collect cord blood, which a patient then provides to a private bank, do not infringe PharmaStem's patents. There is no direct infringement, because doctors and/or hospitals do not practice all of the claimed elements. There is no contributory infringement, because (among other things) neither hospitals nor doctors sell or offer to sell the cord blood. There is no inducement to infringe, because that requires evidence that the doctors or hospitals actively and knowingly aided and abetted another's direct infringement.

20      The context in which PharmaStem's current anticompetitive campaign must be understood includes a recent lawsuit PharmaStem commenced against all of the principal players in the private cord blood banking market. On or about February 22, 2002, PharmaStem filed a lawsuit against ViaCell, Cryo-Cell and CorCell and five other private cord blood banks, alleging infringement of the '553 Patent and the '681 Patent. *PharmaStem Therapeutics, Inc. v ViaCell, Inc. et al.,* Civil Action No. 02-148-GMS (D Del.) (Sleet, J.) (the "Competitor Litigation").

21      The private cord blood bank defendants in the Competitor Litigation denied liability and defended against PharmaStem's allegations on the grounds, *inter alia*, of non-infringement and that the patents were invalid and unenforceable.

22      On or about October 29, 2003, the jury in the Competitor Litigation returned a verdict in PharmaStem's favor

7

23. Following the jury verdict, the parties submitted several post-trial motions. The private cord blood bank defendants moved for, among other things, the entry of judgment of non-infringement as a matter of law or, in the alternative, a new trial.

24. The Court in the Competitor Litigation issued a Memorandum and Order dated September 15, 2004 on the parties' post-trial motions. The Court granted judgment as a matter of law that the private cord blood banks do not infringe the '553 Patent, and granted a new trial on infringement of the '681 Patent. The Court also denied PharmaStem's motions, including its motion for entry of a permanent injunction.

## PHARMASTEM'S ANTICOMPETITIVE CAMPAIGN TO COERCE A BOYCOTT OF PRIVATE CORD BLOOD BANKS

25. Prior to the Court's September 15 Order in the Competitor Litigation, PharmaStem embarked on its improper and anticompetitive scheme targeting hospitals and obstetricians. On information and belief, PharmaStem's purpose and intent was and is to choke off the supply of cord blood to the private cord blood banks that have resisted PharmaStem's efforts to force them to accept a wrongful and overbroad license. Through a variety of means, PharmaStem is bullying health care providers into a boycott of ViaCell, Cryo-Cell and CorCell. In this manner, PharmaStem is attempting to achieve through improper, unfair, deceptive, and anticompetitive practices the goal it is not entitled to achieve under its patents – forcing all private blood banks to accept licenses and pay royalties to PharmaStem in connection with all of their cord blood banking activities, whether or not those activities actually infringe PharmaStem's patents.

26. On or about June 1, 2004, while the post-trial motions in the Competitor Litigation were still pending, PharmaStem began sending to obstetricians, and perhaps to others, letters substantially in the form attached hereto as Exhibit 1 ("the PharmaStem June

8

letter") The PharmaStem June letter contained numerous false and misleading statements concerning the Court's rulings to date, as well as the doctors' potential liability for infringement of PharmaStem's patents. The letter was sent to over 25,000 obstetricians.

27. By Order dated July 2, 2004, this Court (Sleet, J.) found that the PharmaStem June letter contained false and misleading statements. The Court also granted an injunction against further false or misleading communications directed to obstetricians. A copy of the Court's Order is attached hereto as Exhibit 2. In particular, Judge Sleet found, in pertinent part, that:

> 1. PharmaStem's June 1, 2004 letter to Obstetricians (the "PharmaStem Letter") contains false and misleading statements concerning this Court's rulings to date. In particular, the Court finds the following statements in this PharmaStem Letter false and misleading:
>
> > A. "Patent infringement occurs when a person or institute practices all or part of a patented process." The Court finds this statement is misleading because it is black letter law that in order to prove contributory infringement of a method patent, the <u>entire</u> patented process must be performed. By suggesting that infringement would occur when only part of a process in performed, the letter is misleading.
> >
> > B. "In the case of umbilical cord blood collection by an obstetrician, the Court ruled that infringement occurs even if the cryopreservation and storage is performed by a third party." The Court finds this statement misleading for at least the following reasons. <u>First,</u> the sentence states that "the Court ruled" with respect to the "case" of "umbilical cord blood collection by an Obstetrician." This Court never made any rulings regarding conduct by obstetricians. There were no such allegations advanced in the trial of this matter. <u>Second,</u> the sentence leaves out several important elements that must be proved to show contributory infringement. The missing elements include:
> >
> > > 1. that there must be a <u>sale</u> or <u>offer to sell,</u> by the party that is accused of contributory infringement,
> > >
> > > 2. that the party accused of contributory infringement must be "acting in concert or working together"

9

with the other parties whose combined conduct performed each and every element of the patented process, and

3    that, under §271(c), a sale of a service, as opposed to a sale of a tangible physical object, is not sufficient to satisfy the requirements of the contributory infringement statute

The Court finds that without these elements, the statement is misleading

28    PharmaStem followed its June letter with a second wave of lawsuits, in each of which PharmaStem sued a private cord blood bank and one or more health care providers (individual physicians), group medical practices and a hospital, for patent infringement PharmaStem filed five such lawsuits, in locations throughout the country (the "Provider Lawsuits") Those lawsuit are.

(a)    *PharmaStem Therapeutics, Inc. v. Corcell, Inc., Molly McBride, M.D., and Carlo M. Croce, M.D.*, C A No. 04-CV-3561 (E D Pa.)

(b)    *PharmaStem Therapeutics, Inc. v. Cord Blood Registry, Inc. and Sutter Health, Inc.*, C A No 04-3072 (PVT) (N D Cal.)

(c)    *PharmaStem Therapeutics, Inc. v. Cryo-Cell International, Inc. and Bruce Zafran, M.D.*, C A No 8:04-CV-1740-T-30TGW (M D Fla)

(d)    *PharmaStem Therapeutics, Inc. v. Curesource, Inc., Monica Aszlerbaum, Andrew Cassidenti, Eunice U. Lee, Carla Wells, Anita York, Eliot Romero, Kathy Anderson, Nasrin Farbakhsh, Bruce A. Hagadorn, Rahasree T. Seshadri, Arthur Goldstein, and Charles W. Moniak*, SACV04-921 (GLT) (C D Cal)

(e)    *PharmaStem Therapeutics, Inc v. ViaCell, Inc., Obstetrical and Gynecological Associates, P.A., Fempartners, Inc., and Caritas St. Elizabeth's Medical Center of Boston, Inc.*, C A No 04-11673 (RWZ) (D Mass)

10

29      On information and belief, PharmaStem deliberately filed the Provider Lawsuits in locations throughout the country to maximize the effect of those lawsuits in intimidating health care providers – including those not sued by PharmaStem – with the threat of patent litigation.

30      In each of the Provider Lawsuits, PharmaStem made a boilerplate allegation of infringement of the '427 patent against both the defendant private cord blood bank and at least one health care provider.

31      On August 2, 2004, after PharmaStem filed the Provider Lawsuits, PharmaStem issued a press release ("August 2 Press Release"), a copy of which is attached hereto as Exhibit 3. The August 2 Press Release contained statements similar to those in the PharmaStem June Letter which the Court had found to be false and misleading. PharmaStem's press release was at odds with the July 2 injunction. PharmaStem caused copies of the Press Release to be mailed to thousands of obstetricians.

32      Shortly after initiating one of the Provider Lawsuits in the Central District of California against CureSource, Inc., and twelve physicians, PharmaStem sent a letter to the defendant physicians, offering to "settle" with them by agreeing not to enforce any of PharmaStem's five patents against them, provided the doctors would agree (1) not to collect cord blood or provide any service "in connection with" any of the private cord blood banks not licensed by PharmaStem, and (2) agree not to market or offer any service of the defendant cord blood banking companies. A copy of one of these letters, dated August 18, 2004, with the proposed agreement, is attached hereto as Exhibit 4.

33      On or about August 20, 2004, PharmaStem began to send thousands of letters, again containing the same type of misleading statements, to physicians whom it had not sued

11

These letters informed the recipients of PharmaStem's "recent lawsuits filed across the United States against obstetricians who continue to collect cord blood or market services, including distribution of literature, for   ViaCord, CBR (Cord Blood Registry), Cryo-Cell, Corcell and CureSource " PharmaStem also asserted.

> "It is PharmaStem's position, as asserted in the recent lawsuits, that obstetricians are liable for patent infringement if they collect cord blood or market services for unlicensed cord blood banks
>
> In an effort to avoid legal action from PharmaStem relating to its patents, please review and sign the attached Amnesty Agreement " (emphasis added)

A copy of one of these letters is attached hereto as Exhibit 5

34    Attached to these letters was a so-called "Amnesty Agreement," which PharmaStem insisted that the doctors sign to avoid legal action by PharmaStem  As in the case of the August 18, 2004 letter, the Amnesty Agreement required the physicians to agree "not to collect cord blood or market or offer the service of cord blood collection in connection with the unlicensed cord blood banks listed below " A copy of an "Amnesty Agreement" is attached hereto as Exhibit 6  None of PharmaStem's patents could support such a broad and sweeping restriction on the activities of doctors

35    On or about September 14, 2004, PharmaStem sent another letter to obstetricians  This letter purported to be a settlement communication, but actually was a thinly-veiled attempt to bully and threaten obstetricians into joining PharmaStem's boycott  In this letter, PharmaStem threatened the doctors it had sued with "considerable time, expense, intrusion, and other inevitable tangible and intangible costs" if the doctors refused to settle  As with PharmaStem's other letters, this letter conditioned settlement on the doctors' agreeing to the same overbroad requirement "to collect only for one of the many cord blood banks already

12

operating under a license from PharmaStem" (emphasis added) A sample of this communication is attached hereto as Exhibit 7

36    PharmaStem issued another misleading press release on or about September 20, 2004, after the Court in the Competitor Litigation issued its Order finding no infringement of the '553 Patent and granting a new trial on infringement of the '681 Patent The September 20 Press Release mischaracterizes the Court's ruling as well as defendants' positions in the Competitor Litigation For example, PharmaStem states that defendants argued that families who bank blood with them could be liable for infringement and that the Court "agreed with the defendants" in that regard. In fact, the basis for the Court's decision was that the defendants did not sell or offer to sell cord blood Defendants in the Competitor Litigation did not argue that families are liable for infringing PharmaStem's patents, parents do not sell or offer to sell cord blood, and therefore cannot be liable This is but the latest false implication designed to deter patients from seeking services from ViaCell, Cryo-Cell, CorCell and other private banks without regard to the narrow limitations of PharmaStem's patents A copy of the press release is attached hereto as Exhibit 8.

37    On September 22, 2004, PharmaStem (through its counsel) sent a communication to the American College of Obstetricians and Gynecologists ("ACOG"). According to its website, the ACOG has over 46,000 members and is "the nation's leading group of professionals providing health care for women" The communication states, among other things, that "PharmaStem has filed patent infringement lawsuit against over two dozen physicians who work with the four unlicensed cord blood banks", that the "PharmaStem Amnesty Program has been joined by hundreds of physicians", and that another professional society "has recommended its members join the Amnesty Program as a precautionary measure

13

against being named as a defendant in a lawsuit " A copy of this communication is attached as Exhibit 9

38      The Press Release of August 2, 2004, the letters of August 18, August 20, and September 14, 2004, the Press Release of September 20, 2004, and the communication of September 22, 2004 to the ACOG, were disseminated after PharmaStem had already made misrepresentations in the earlier PharmaStem June Letter  As such, they served to confirm and bolster the earlier misrepresentations and to perpetuate and reinforce false impressions about the scope of PharmaStem's patents and the risk of liability in the eyes of obstetricians, other health care providers and the public   The press releases, the letters, and the ACOG communication made no attempt to correct the earlier misrepresentations, to disclose the inaccuracies of the earlier misrepresentations, to accurately disclose the ruling of the Court in the Competitor Litigation, or to accurately describe the scope and limitations of PharmaStem's patents   In the Settlement Agreement, the Amnesty Agreement and the cover letters accompanying them PharmaStem failed to disclose the limitations on theories of indirect infringement that Judge Sleet ordered were necessary to avoid deception

39      Even after reversal of the jury verdicts of infringement, PharmaStem continues to display a statement prominently on its website stating. "On October 29, 2003, a Delaware jury unanimously found that     ViaCord, CBR (Cord Blood Registry), Cryo-Cell and CorCell had willfully infringed [the '681 and '553] patents " This web page makes no reference to the fact that the Court subsequently overturned those verdicts, and is thus misleading  PharmaStem has refused a request to stop running statements concerning the overturned jury verdict  A printout from the web page dated October 5, 2004, is attached hereto as Exhibit 10

14

40    Concurrently with this campaign of deception and intimidation, PharmaStem purchased "sponsored links" on Internet search engines, such as Google and Yahoo, in which it identifies ViaCell, Cryo-Cell and CorCell as "unlicensed bank[s]," without direct reference to PharmaStem's patents, and states. "Why Take a Risk?" This advertisement and unauthorized use of ViaCell's, Cryo-Cell's and CorCell's trademarks is designed to, and does, create the misleading impression that ViaCell, Cryo-Cell and CorCell are cord blood banks that are not licensed, for example, by state health departments and, consequently, that they are in imminent danger of being shut down In fact, ViaCell, Cryo-Cell and CorCell hold all state licenses required to operate a private umbilical cord blood banking service This conduct constitutes disparagement and unfair and deceptive trade practices

41    The campaign of deception and intimidation undertaken by PharmaStem was intended to create misapprehension in the minds of physicians that they risk potential liability for infringement of the PharmaStem Patents even if they merely collect umbilical cord blood for a patient who is a customer of ViaCell, Cryo-Cell or CorCell PharmaStem's actions also were designed to dissuade or prevent consumers from purchasing the services the cord blood banks that have not bowed to PharmaStem's extortionate tactics

42    Under no proper interpretation of any claim of the PharmaStem Patents would an obstetrician be liable for patent infringement based merely on collecting umbilical cord blood at the time of a delivery and providing it to the patient for the patient's shipment to a private cord blood bank. PharmaStem does not hold a good faith belief that such conduct by physicians could provide a basis for infringement liability

43    Indeed, such improper threats, based upon such a clearly erroneous interpretation of the statute, of such enforcement constitute a misuse of the PharmaStem Patents This

15

conduct also constitutes an improper and anticompetitive attempt to use PharmaStem's patents to cover unpatented activities

## THE THREATENED AND ACTUAL ANTICOMPETITIVE EFFECTS
## OF PHARMASTEM'S CONDUCT

44    PharmaStem's campaign to coerce a boycott by health care providers against ViaCell, Cryo-Cell, CorCell and other private cord blood banks through the Amnesty Agreements threatens to unreasonably restrain trade in the market for private cord blood banking services   The boycott is intended to coerce, and unless enjoined threatens to have the effect of coercing, all or substantially all private cord blood banks into signing licenses with PharmaStem   Those licenses are wrongful, overbroad, and anticompetitive, because they require blood banks to pay royalties to PharmaStem for activities that do not infringe PharmaStem's patents.

45    The Amnesty Agreements that PharmaStem is using to implement its boycott also are improper and anticompetitive   Those agreements, individually and collectively, are designed and intended to deprive consumers of access to private cord blood banks where they do not have to pay an improper overcharge caused by PharmaStem's wrongful licenses   The terms of those agreements are far broader than is necessary to settle any legitimate claims for patent infringement PharmaStem may have against any hospitals or physicians    The overbreadth of those agreements serves no legitimate business purpose of PharmaStem and unduly restricts competition

46    PharmaStem's Amnesty Agreements require the signing physician or hospital to "agree[] not to [1] collect cord blood or [2] market or [3] offer the service of cord blood collection in connection with the unlicensed cord blood banks listed below"   The Amnesty

16

Agreements then list the private cord blood banks that have refused to accept PharmaStem's wrongful licenses. *See* Exhibit 6 (emphasis added).

47.    By requiring the hospitals or physicians to agree to a blanket refusal to deal with ViaCell, Cryo-Cell and CorCell, PharmaStem's Amnesty Agreements go substantially beyond any legitimate right to exclude arising from PharmaStem's patents. The Amnesty Agreements improperly prevent hospitals and doctors from performing services in connection with ViaCell, Cryo-Cell and CorCell that do not infringe any claim in any of PharmaStem's patents.

48.    According to PharmaStem, "80% of the private umbilical cord blood companies in the United States are now operating under its licensed patents." That means that those companies are now paying royalties to PharmaStem pursuant to those licenses. The license agreements are improper and anticompetitive to the extent they require blood banks to pay royalties to PharmaStem for activities that do not infringe PharmaStem's patents.

49.    According to PharmaStem, hundreds of doctors have signed PharmaStem's Amnesty Agreements as of the date of this filing. ViaCell, Cryo-Cell and CorCell are aware of numerous doctors and hospitals who have stated they will no longer collect blood for patients wishing to store it at ViaCell, Cryo-Cell and CorCell; of course, they do not know how many others have taken the same position without informing ViaCell, Cryo-Cell and CorCell. PharmaStem continues to target doctors and hospitals. As a result, ViaCell, Cryo-Cell and CorCell are being substantially foreclosed from access to cord blood, a necessary input to the business of providing private cord blood banking services. The degree of foreclosure will continue to rise if PharmaStem is allowed to continue with its wrongful course of conduct unchecked.

17

50      In response to PharmaStem's campaign, at least one certain professional society advised obstetricians "to exercise extreme caution" and stated that "[t]hose wishing to insulate themselves from any possible litigation may want to execute the [Amnesty] Agreement" *See* Exhibit 11

51      The Amnesty Agreements are purely private agreements between PharmaStem and the other parties who sign them

52      Certain obstetricians and hospitals have refused, and are refusing, to collect <u>any</u> umbilical cord blood, regardless of the bank where it will be stored, as a result of PharmaStem's conduct  Patients of such doctors who otherwise would collect and preserve umbilical cord blood suffer clear and irreparable harm  Once the opportunity to collect cord blood at the time of birth is foregone or lost, it can never be recovered

53      PharmaStem's wrongful campaign also threatens to give PharmaStem the power to control prices or exclude competition in the market for private cord blood banking services PharmaStem's power arises from, and is reflected in, its forcing of overbroad license agreements with their attendant royalty fees on private cord blood banks  If PharmaStem succeeds in forcing all or nearly all private cord blood banks to sign such overbroad license agreements, or succeeds through the boycott it is organizing in driving unlicensed private cord blood banks out of business, PharmaStem will have wrongfully acquired monopoly power

54      On information and belief, at least some private cord blood banks have raised the prices they charge to customers for storing cord blood as a result of the royalties they must pay PharmaStem  Most or all of the remaining private banks that have signed licenses are likely to raise their prices as well because of the costs to the banks of the royalty payments

18

55    Some or all of the royalty fees PharmaStem is charging to private cord blood banks, and some or all of the resulting increase in prices that private cord blood banks charge to families for storage services, constitutes an anticompetitive overcharge. Given the overbroad nature of PharmaStem's licenses, private cord blood banks are paying royalties to PharmaStem (and charging customers for the costs of those royalties) in connection with activities that do not infringe PharmaStem's patents. Thus, at least some consumers are already suffering the anticompetitive effects of PharmaStem's anticompetitive scheme.

56    If PharmaStem succeeds through its wrongful Amnesty Agreements and other conduct in forcing ViaCell, Cryo-Cell and CorCell to accept PharmaStem's wrongful license, or alternatively drives those companies out of the market, families will be left with no choice but to store their blood with a private bank that is required to pay royalty fees to PharmaStem. As a result, families will have no choice but to pay supracompetitive prices for private cord blood banking services as a result of the anticompetitive overcharge created by PharmaStem's wrongful licenses.

## THE RELEVANT MARKET

57    Starting in the late 1980s, several companies began to offer families a service for the collection and storage of cord blood for potential use in therapeutic transfusions. Cord blood that is collected at the time of delivery for preservation is then transported to other facilities, where it is tested and cryogenically preserved. Facilities that store cord blood are referred to as cord blood "banks." Hospitals do not provide cord blood banking services themselves.

58    The only way for cord blood banks to obtain cord blood for storage is for families to decide to preserve cord blood immediately following delivery and elect to store it

19

with a particular bank  Once cord blood has been collected and preserved at one blood bank, it typically is not sold or transferred to another blood bank for storage

59     There are two types of cord blood banks: private and public   Private blood banks charge parents fees for the collection, transportation, processing, and storage of cord blood  The parents retain ownership over the blood samples stored in private blood banks and may withdraw the blood without cost

60     Public cord blood banks typically do not charge parents for donating cord blood  Public cord blood banks take ownership of the cord blood they store, and typically charge for the use or withdrawal of cord blood samples   Public cord blood banks tend to store only relatively common HFA types, and there is no guarantee that cord blood donated to public banks will be stored  As a result, parents who donate cord blood to public banks have no assurance that the blood they donated would be available for them in the future as do parents who store cord blood at private banks   Nor is it always possible to find a match from an unrelated donor

61     Many consumers view private cord blood banking as a form of insurance   These consumers value knowing that the cord blood would be there should it be needed in the future  Thus, they are willing to pay to have the cord blood stored, even though only a small fraction of the units stored actually get used at a later date for therapeutic transfusions   In addition, clinical studies show that patients who receive cord blood from related donors have higher survival rates than patients who receive cord blood from unrelated donors   Parents who store cord blood in private banks know that the specific blood they stored will be available for them in the future, if necessary

20

62    Public cord blood banks do not offer this same insurance feature or family benefit. Because public banks take ownership of the blood units, they are entitled to provide the blood units to someone other than the donor family

63    On information and belief, PharmaStem itself does not view public cord blood banks as reasonable substitutes for, or to be reasonably interchangeable with, private cord blood banks  Among other things, in PharmaStem's communications with doctors, PharmaStem's references to cord blood banks routinely list only private banks, without mentioning public banks.

64    The provision of private cord blood banking services in the United States constitutes a relevant market for purposes of the antitrust laws

## THREATENED AND ACTUAL INJURY TO VIACELL, CRYO-CELL AND CORCELL

65    The improper boycott PharmaStem is implementing against ViaCell, Cryo-Cell and CorCell is causing substantial damage to their business and threatens to cause additional such damage unless PharmaStem's conduct is enjoined

66    ViaCell, Cryo-Cell and CorCell will be irreparably harmed as a direct and proximate result of PharmaStem's conduct alleged herein unless PharmaStem is enjoined  That irreparable will include, but not be limited to, loss of goodwill, loss of business, and loss of customers. Those harms cannot be adequately remedied through money damages

67    As a direct and proximate result of PharmaStem's conduct alleged herein, including the false and misleading statements PharmaStem has made and the Amnesty Agreements PharmaStem has imposed on health care providers, ViaCell, Cryo-Cell and CorCell also have lost business and are threatened with continuing loss of business from families who otherwise would store cord blood for preservation with ViaCell, Cryo-Cell or

21

CorCell but who now have not and will not do so   As a result of this lost business, ViaCell, Cryo-Cell and CorCell are losing and are threatened with continuing loss of revenues they otherwise would receive and profits they otherwise would earn from storing cord blood

68    In the past few weeks, hospitals and physicians have informed ViaCell, Cryo-Cell and CorCell that they will no longer collect cord blood for patients to supply to ViaCell, Cryo-Cell and CorCell for preservation   Customers of ViaCell, Cryo-Cell and CorCell have also discontinued their plans to store blood at ViaCell, Cryo-Cell and CorCell because their doctors refused to perform the collection   Other hospitals and medical practices have discontinued cord blood collections altogether, resulting in further business losses for ViaCell, Cryo-Cell and CorCell   Various physician associations are advising their members not to collect cord blood for storage by the blood banks that have refused PharmaStem's licenses Hospitals' and physicians' unwillingness to collect cord blood for families who wish to store the blood with ViaCell, Cryo-Cell and CorCell results directly from PharmaStem's wrongful conduct as alleged herein

69    The injury to ViaCell, Cryo-Cell and CorCell resulting from PharmaStem's conduct constitutes antitrust injury

### COUNT I
### (For Declaratory Judgment under 28 U.S.C. § 2201
### Based on Threatened and Actual Violations of the Antitrust Laws)

70    ViaCell, Cryo-Cell and CorCell repeat and incorporate the allegations of Paragraphs 1 through 69 as if set forth here in full

71    ViaCell, Cryo-Cell and CorCell assert this claim for declaratory judgment pursuant to 28 U S C  § 2201 *et seq.*

72    There is an actual controversy between ViaCell, Cryo-Cell and CorCell, on one hand, and PharmaStem on the other concerning the lawfulness of PharmaStem's conduct as

described in this complaint under the federal antitrust laws, the federal Lanham Act, and other state laws

73.    ViaCell, Cryo-Cell and CorCell seek a declaration that PharmaStem's conduct, as described in this Complaint, impermissibly threatens to restrain trade in and has restrained trade in, impermissibly attempts to monopolize, and impermissibly threatens to monopolize the relevant market, all in violation of the federal antitrust laws, 15 U.S.C. § 1 *et seq.*, and in violation of other federal and state law, and justifies the granting of relief to ViaCell under Section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT II
### (Violation of 15 U.S.C. § 1 –Threatened Restraint of Trade – Injunctive Relief)

74.    ViaCell, Cryo-Cell and CorCell repeat and incorporate the allegations of Paragraphs 1 through 73 as if set forth here in full.

75.    The provision of private cord blood banking services in the United States constitutes a relevant product market.

76.    PharmaStem has entered into agreements in restraint of trade with numerous hospitals and/or physicians and, unless enjoined, threatens to enter into additional such agreements in restraint of trade with other hospitals and/or physicians.

77.    The agreements PharmaStem has entered into, and threatens to enter into, with hospitals and/or physicians do and will constitute a substantial and unreasonable restraint of trade.

78.    The agreements PharmaStem has entered into, and threatens to enter into, with hospitals and/or physicians do and will have a substantial effect on interstate commerce.

79.    The agreements PharmaStem has entered into, and threatens to enter into, with hospitals and/or physicians threaten to cause loss or injury to ViaCell, Cryo-Cell and CorCell.

23

80      The loss or injury with which ViaCell, Cryo-Cell and CorCell are threatened as a result of PharmaStem's unreasonable agreements in restraint of trade does and will constitute antitrust injury

81.     The threat of loss or injury from PharmaStem's conduct is substantial and immediate

82      ViaCell, Cryo-Cell and CorCell are entitled to preliminary and permanent injunctive relief pursuant to 15 U S C  § 26 against threatened loss or damage in violation of the antitrust laws, including without limitation Section 1 of the Sherman Act, 15 U S C  § 1

## COUNT III
### (Violation of 15 U.S.C. § 2 –Threatened Monopolization – Injunctive Relief)

83.     ViaCell, Cryo-Cell and CorCell repeat and incorporate the allegations of Paragraphs 1 through 82 as if set forth here in full

84      The provision of private cord blood banking services in the United States constitutes a relevant product market

85.     PharmaStem threatens to violate Section 2 of the Sherman Act (15 U S C. § 2) by willfully and unlawfully acquiring monopoly power in the relevant market by engaging in its ongoing and continuous pattern of exclusionary and anticompetitive conduct, as alleged above, including but not limited to:

(a)     making false and misleading statements to doctors, hospitals, families, and the public;

(b)     intimidating doctors and hospitals through objectively unreasonable and overbroad actual or threatened claims of potential patent liability; and

24

       (c)     entering into wrongful and overbroad licensing agreements with certain private cord blood banks that require the payment of royalties to PharmaStem even for activities that do not infringe any claim of PharmaStem's patents, and

       (d)     entering in wrongful and overbroad "Amnesty Agreements" or other agreements with doctors and/or hospitals that require the doctors and/or hospitals to boycott the private cord blood banks that have refused PharmaStem's wrongful license demands, thereby preventing even non-infringing activities

86.     PharmaStem's conduct threatens to cause injury to competition in the form of, among other things, higher prices paid by consumers for private cord blood banking services than they would pay but for PharmaStem's wrongful conduct

87     PharmaStem's conduct threatens to injure ViaCell, Cryo-Cell and CorCell in the form of, among other things, lost profits resulting from lost opportunities to provide cord blood banking services as a result of PharmaStem's wrongful conduct, including but not limited to the Amnesty Agreements

88.     PharmaStem's improper and anticompetitive conduct will be a direct and proximate cause of the threatened injuries to competition and to ViaCell, Cryo-Cell and CorCell complained of herein

89     The threat of injury and loss from PharmaStem's wrongful conduct is immediate and substantial

90     The injuries that PharmaStem's conduct threatens to cause to ViaCell, Cryo-Cell and CorCell are of the type that the Sherman and Clayton Acts were intended to prevent and flow from that which makes PharmaStem's acts unlawful under the Sherman and Clayton Acts

91    PharmaStem's conduct has, and threatens to have, a substantial affect on interstate commerce

92    ViaCell is entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 26 against threatened loss or damage in violation of the antitrust laws, including without limitation Section 2 of the Sherman Act, 15 U.S.C. § 2

## COUNT IV
### (Violation of 15 U.S.C. § 1 –Unreasonable Restraint of Trade – Damages)

93    ViaCell, Cryo-Cell and CorCell repeat and incorporate the allegations of Paragraphs 1 through 92 as if set forth here in full

94    The provision of private cord blood banking services in the United States constitutes a relevant product market

95    PharmaStem has entered into agreements in restraint of trade with numerous hospitals and/or physicians

96    The agreements PharmaStem has entered into with hospitals and/or physicians substantially and unreasonably restrain trade

97    The agreements PharmaStem has entered into with hospitals and/or physicians have had a substantial effect on interstate commerce

98    PharmaStem's conduct has injured competition through, among other things, higher prices paid by consumers for private cord blood banking services than they would pay but for PharmaStem's wrongful conduct

99    PharmaStem's conduct had injured ViaCell, Cryo-Cell and CorCell through, among other things, lost profits resulting from lost opportunities to provide cord blood banking services as a result of PharmaStem's wrongful conduct, including but not limited to the Amnesty Agreements

26

100    PharmaStem's improper and anticompetitive conduct has directly and proximately caused the injuries to competition and to ViaCell, Cryo-Cell and CorCell complained of herein.

101    These injuries from PharmaStem's conduct constitute antitrust injury and are of the type that the Sherman and Clayton Acts were intended to prevent and flow from that which makes PharmaStem's acts unlawful under the Sherman and Clayton Acts.

102    ViaCell, Cryo-Cell and CorCell are entitled to damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, including treble damages, reasonable attorneys' fees, and costs, for the losses suffered from PharmaStem's violation of the antitrust laws, including without limitation Section 1 of the Sherman Act, 15 U.S.C. § 1.

## COUNT V
**(Violation of 15 U.S.C. § 2 – Attempted Monopolization – Damages)**

103    ViaCell, Cryo-Cell and CorCell repeat and incorporate the allegations of Paragraphs 1 through 102 as if set forth here in full.

104    There is a dangerous probability that PharmaStem will acquire monopoly power in the market for private blood banking services in the United States.

105    PharmaStem has acted with specific intent to monopolize.

106    PharmaStem is engaging in its ongoing and continuous pattern of exclusionary and anticompetitive conduct in furtherance of its attempt to monopolize, as alleged above, including but not limited to:

(a)    making false and misleading statements to doctors, hospitals, families, and the public;

(b)    intimidating doctors and hospitals through objectively unreasonable and overbroad actual or threatened claims of potential patent liability; and

27

(c)    entering into wrongful and overbroad licensing agreements with certain private cord blood banks that require the payment of royalties to PharmaStem even for activities that do not infringe any claim of PharmaStem's patents, and

(d)    entering in wrongful and overbroad "Amnesty Agreements" or other agreements with doctors and/or hospitals that require the doctors and/or hospitals to boycott the private cord blood banks that have refused PharmaStem's wrongful licenses, thereby preventing even non-infringing activities

107    PharmaStem's conduct has had a substantial effect on interstate commerce

108    PharmaStem's conduct has injured competition through, among other things, higher prices paid by consumers for private cord blood banking services than they would have paid but for PharmaStem's wrongful conduct

109    PharmaStem's conduct has injured ViaCell, Cryo-Cell and CorCell through, among other things, lost profits resulting from lost opportunities to provide cord blood banking services as a result of PharmaStem's wrongful conduct, including but not limited to the Amnesty Agreements

110    PharmaStem's improper and anticompetitive conduct has directly and proximately caused the injuries to competition and to ViaCell, Cryo-Cell and CorCell complained of herein

111    These injuries from PharmaStem's conduct constitute antitrust injury and are of the type that the Sherman and Clayton Acts were intended to prevent and flow from that which makes PharmaStem's acts unlawful under the Sherman and Clayton Acts

112    ViaCell, Cryo-Cell and CorCell are entitled to damages pursuant to Section 4 of the Clayton Act 15 U S C § 15, including treble damages, reasonable attorneys' fees, and

28

costs, for the losses suffered from PharmaStem's violation of the antitrust laws, including without limitation Section 2 of the Sherman Act, 15 U.S.C. § 2

## COUNT VI
### (Federal Unfair Competition in violation of the Lanham Act
### 15 U.S.C. § 1125(a))

113.    ViaCell, Cryo-Cell and CorCell repeat and incorporate the allegations of Paragraphs 1 through 112 as if set forth here in full

114.    PharmaStem has made false and misleading statements as to the services ViaCell, Cryo-Cell and CorCell provide

115.    PharmaStem's statements create an actual deception or at least a tendency to deceive a substantial portion of PharmaStem's intended audiences.

116.    The deception is material and is likely to influence decisions by families who may desire to have their child's cord blood preserved by ViaCell, Cryo-Cell and CorCell, either directly or by causing physicians and hospitals to refuse to collect cord blood for such patients, or by causing physicians to discourage patients from storing cord blood with those blood banks.

117.    These services are provided and sold in and affect a substantial amount of interstate commerce.

118.    There is a likelihood that ViaCell, Cryo-Cell and CorCell have been and will be injured by PharmaStem's false statements, including in the form of lost business by customers who either do not store cord blood or store it with a different blood bank

119.    ViaCell, Cryo-Cell and CorCell are entitled to compensatory damages and an injunction against further false statements by PharmaStem.

## COUNT VII
### (Unfair and Deceptive Trade Acts, Practice, and Competition
### in violation of Mass. Gen. Laws Chapter 93A, §§ 2 and 11)

29

120.   ViaCell repeats and incorporates the allegations of Paragraphs 1 through 119 as if set forth here in full

121.   PharmaStem is engaged in trade or commerce as defined by Mass. Gen. Laws Chapter 93A, § 2

122.   PharmaStem's conduct as alleged in this complaint constitutes unfair and deceptive trade acts and practices and unfair competition, in violation of Chapter 93A

123.   PharmaStem's violation of Chapter 93A was willful and knowing

124.   PharmaStem's conduct took place primarily and substantially in Massachusetts

125.   ViaCell has been injured by PharmaStem's unlawful conduct

126.   ViaCell is entitled to recover single and multiple damages for its injuries, attorneys fees, and costs pursuant to Mass. Gen. Laws Chapter 93A, § 11.   ViaCell also is entitled to injuctive relief pursuant to Mass. Gen. Laws Chapter 93A, § 11

### COUNT VIII
**(Tortious Interference with Contract)**

127.   ViaCell, Cryo-Cell and CorCell repeat and incorporate the allegations of Paragraphs 1 through 126 as if set forth here in full

128.   ViaCell, Cryo-Cell and CorCell have valid contracts or business relationships with families to provide private cord blood banking services that contemplate economic benefit to ViaCell, Cryo-Cell and CorCell

129.   PharmaStem knew about these contracts and business relationships.

130.   PharmaStem interfered with these contracts and business relationships for improper purposes and by improper means

131.   PharmaStem's conduct warrants condemnation and deterrence

30

132    ViaCell, Cryo-Cell and CorCell have suffered damages as a result of PharmaStem's interference

133    ViaCell, Cryo-Cell and CorCell are entitled to recover compensatory and punitive damages for their injuries

## COUNT IX
### (Tortious Interference with Prospective Advantageous Relationships)

134    ViaCell, Cryo-Cell and CorCell repeat and incorporate the allegations of Paragraphs 1 through 133 as if set forth here in full

135    ViaCell, Cryo-Cell and CorCell have present and past prospective advantageous relationships with families to provide private cord blood banking services that contemplate economic benefit to ViaCell, Cryo-Cell and CorCell

136    PharmaStem knew about these prospective advantageous relationships

137    PharmaStem interfered with these prospective advantageous relationships for improper purposes and by improper means

138    PharmaStem's conduct warrants condemnation and deterrence

139    ViaCell, Cryo-Cell and CorCell have suffered damages as a result of PharmaStem's interference

140    ViaCell, Cryo-Cell and CorCell are entitled to recover compensatory and punitive damages for their injuries

## COUNT IX
### (Unfair and Deceptive Trade Practices in violation of Fla. Stat. § 501.201, et seq.)

141    Cryo-Cell repeats and incorporates the allegations of Paragraphs 1 through 140 as if set forth here in full

142    PharmaStem's conduct as alleged in this complaint constitutes deceptive and unfair trade practices in violation of the Florida Deceptive and Unfair Trade Practices Act

31

143    Cryo-Cell has been injured by PharmaStem's unlawful conduct, and are likely to suffer further damage unless said conduct is restrained  Cryo-Cell is entitled to recover damages and counsel fees as a result of PharmaStem's violation

## PRAYER FOR RELIEF

WHEREFORE, ViaCell, Cryo-Cell and CorCell ask that the Court:

A.     Grant a declaratory judgment that PharmaStem's conduct alleged in this Complaint threatens to violate, and violates, the federal antitrust laws, 15 U S C § 1 et seq.;

B      Enter a preliminary and permanent injunction enjoining PharmaStem's ongoing wrongful conduct, including but not limited to enforcement of the Amnesty Agreements, pursuant to, inter alia, 15 U S.C  § 26 and Mass  Gen  Laws Chapter 93A, § 11,

C      Award treble damages, attorneys' fees, and costs pursuant to Section 4 of the Clayton Act, 15 U S C  § 15, for PharmaStem's violations of the federal antitrust laws, 15 U S C  § 1 et seq.;

D      Award ViaCell single and multiple damages, attorneys' fees, and costs pursuant to Mass  Gen  Laws Chapter 93A, § 11, based on PharmaStem's unfair and deceptive trade acts and practices and unfair competition in violation of Chapter 93A, § 2;

E.     Award Cryo-Cell compensatory damages, attorneys' fees, and costs pursuant to the Florida Deceptive and Unfair Trade Practices Act, based on PharmaStem's unfair and deceptive trade acts and practices and unfair competition in violation of Chapter 93A, § 2,

F      Award ViaCell, Cryo-Cell and CorCell compensatory and punitive damages; and

32

G    Grant ViaCell, Cryo-Cell and CorCell such other and further relief as the Court

deems just and proper

Jeffrey L Moyer, Esq (#3309)
Alyssa M Schwartz (#4351)
Richards, Layton & Finger
One Rodney Square
P O Box 551
Wilmington, DE 19899
(302) 651-7700
On behalf of ViaCell, Inc

Dawn N Zubrick (#4327)
Dilworth Paxson LLP
First Federal Plaza
Suite 500
Wilmington, DE 19801
(302) 571-9800
On behalf of Cryo-Cell International, Inc
and CorCell, Inc

33

*Of Counsel*:
Paul F Ware, Jr , P C
John C Englander, Esq
James C Rehnquist, Esq
Elaine Herrmann Blais, Esq
Christopher T Holding, Esq
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
On behalf of ViaCell, Inc

James J Rodgers
Evelyn H McConathy
Dilworth Paxson LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA 19103-7595
On behalf of Cryo-Cell International, Inc and
CorCell, Inc

RLF1-2796825-1